# EXHIBIT A

IHOP #1385

## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement") is made and entered into as of this _12th_ day of _October_, 2005, (the "Effective Date") by and between INTERNATIONAL HOUSE OF PANCAKES, INC. (hereinafter referred to as "Franchisor") and 1385 - TYLER, INC., a Texas corporation (hereinafter referred to as "Franchisee") with reference to the following facts:

  A. Franchisor has developed and is continuing to develop certain Systems for operating IHOP Restaurants under the names "IHOP," "The International House of Pancakes" and "International House of Pancakes Restaurant" which feature the sale of pancakes and various other food products, and which, conducted in accordance with the provisions of this Agreement and Franchisor's Operations Bulletins, are designed to enable such businesses to compete more effectively in their respective marketplaces;

  B. Franchisor now owns or licenses and hereafter will develop, license or purchase valuable Trademarks used in connection with the operation of IHOP Restaurants; and

  C. Franchisee desires to obtain a franchise to use the Systems and the Trademarks associated therewith in connection with the operation of one Franchised Restaurant at a specific Franchised Location, and Franchisor is willing to grant said franchise upon the terms and subject to the conditions set forth below. Franchisee has executed this Agreement pursuant to the following (check one):

    [ ] Area Development Agreement, dated _____
    [ ] Multi-Store Development Agreement, dated _____
    [ ] Novation Program
    [ ] Single Store Development Program
    [ ] Purchase Program
    [ ] Renewal or extension of an existing franchise
    [ ] Assignment of an existing franchise
    [X] Other



WHEREFORE, IT IS AGREED:

## I
## GRANT OF FRANCHISE

1.01 Use of Systems.

  Franchisor hereby grants to Franchisee and Franchisee hereby accepts a franchise to operate one Franchised Restaurant at the Franchised Location during the Term hereof in accordance with the provisions of this Agreement and any ancillary documents pertaining hereto.

1.02 Certain Definitions

  "Affiliate" when used herein in connection with Franchisor or Franchisee, includes each Business Entity which directly, or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with Franchisor or Franchisee, as applicable. Without limiting the foregoing, the term "Franchisee-

Affiliate" includes any Business Entity more than 49% of whose stock, membership interests, Partnership Rights, or other equity ownership interests (collectively "Equity") or voting control, is held by person(s) or Business Entities who, jointly or severally, hold more than 49% of the Equity or voting control of Franchisee.

"Applicable Law" means and includes all applicable common law and all applicable statutes, laws, rules, regulations, ordinances, policies and procedures established by any Governmental Authority, which governs the construction or operation of the Franchised Restaurant, including all building codes and local zoning provisions, and all labor, disability, food and drug laws and regulations, as in effect on the Effective Date, and as may be amended from time to time.

"Business Entity" means any limited liability company or partnership, general partnership or limited partnership, and any trust, association, corporation or other entity which is not an individual.

"Continuing Royalty" shall have the meaning given that term in Section 6.01 below.

"Franchised Area" shall mean that geographic area which is either described in, or outlined on a map attached hereto as, Exhibit "A".

"Franchised Location" shall have the meaning given that term in Section 2.01.

"Franchised Restaurant" means the IHOP Restaurant franchised pursuant to this Agreement.

"Governmental Authority" means and includes all Federal, state, county, municipal or local governmental or quasi-governmental agencies, commissions and authorities.

"Gross Sales", as used in this Agreement, shall mean the total revenues derived by Franchisee in and from the Franchised Restaurant, whether for cash sales of food and other merchandise or otherwise, or charge sales thereof, or revenues from any source arising out of the operation of the Franchised Restaurant, deducting therefrom: (a) all refunds and allowances, if any; (b) any sales or excise taxes which are separately stated and which Franchisee collects from customers and pays to any federal, state or local taxing authority; and (c) any amounts deposited in any vending machines or pay telephones which are located in or about the Franchised Restaurant, if said vending machines and/or pay telephones are leased and not owned by Franchisee, in which case Gross Sales shall include only the commissions Franchisee receives therefrom.

"IHOP Restaurant" means a restaurant operated under Franchisor's Trademarks and in accordance with the Franchisor's Systems and specializing in the sale of pancakes and other authorized menu items.

"Initial Term" shall have the meaning given that term in Section 3.01.

"Leasing Affiliate" means the Affiliate of Franchisor which is the Franchisee's sublessor for the Franchised Location, if applicable.

"Local Advertising Fee" shall have the meaning given that term in Section 7.02.

"Majority Owner" means any owner which, directly or indirectly, owns 51% or more of the Stock of Franchisee.

"Master Lease," if applicable, means the lease for the Franchised Location under which Franchisor or its Leasing Affiliate  is the lessee, and pursuant to which Franchisor or its Leasing Affiliate has subleased the Franchised Location to Franchisee.

"National Advertising Fee" shall have the meaning given that term in Section 7.01.

"New Master Lease" shall have the meaning given such term in Section 3.07(a).

"Novation Program" means the Franchisor's program pursuant to which Franchisee has substituted this Agreement for a preexisting franchise agreement.

"Operations Bulletins" shall mean the Franchisor's Operations Manual, and all bulletins, notices, and supplements thereto, and all ancillary manuals, specifications and materials, as the same may be amended and revised from time to time.

"Owner" shall mean a shareholder, general partner, limited partner, member, or other owner of the Business Entity.

"Partnership" shall mean and include any general partnership and limited partnership.

"Partnership Right" shall mean the voting power, property, profits or losses, or partnership interests of a Partnership, or any of them.

"Purchase Program" means Franchisor's program pursuant to which the Franchisee assumes the ownership, operation and management of an IHOP Restaurant which was developed and/or operated by Franchisor or its Affiliate prior to the execution hereof.

"Renewal Term" shall have the meaning given that term in Section 3.02 or 3.03 as the context requires.

"Single Store Development Program" means Franchisor's program pursuant to which Franchisee leases or purchases the Franchised Location and either converts an existing restaurant into an IHOP restaurant or develops, constructs and equips an IHOP Restaurant thereat in accordance with Franchisor's current standards and specifications.

"Stock" shall mean all corporate shares (whether common, preferred or otherwise) in the case of a corporation, all membership interests in the case of a limited liability company, a partner's Partnership Rights in a Partnership, and in all cases all voting rights in the Business Entity.

"Systems" means the systems, products, methods, techniques and other Trade Secrets designated by Franchisor for Franchisee's use in connection with the Franchised Restaurant.

"Table Allowances" shall mean all rebates, allowances, discounts and other monetary compensation received by Franchisor or its Affiliate on account of the purchase of food items, supplies or services by all franchisees in consideration for the open display by all franchisees of a supplier's product, trademark or logo. "Table Allowances" shall not include any allowances granted on account of purchases by less than all Franchisees.

"Term" means and includes the Initial Term of this Agreement, and any and all extensions and renewals thereof.

"Trademarks" means those trademarks, service marks, trade names, logotypes, insignia, labels, designs and other commercial symbols, which Franchisor may from time to time authorize or direct Franchisee to use in connection with the operation of the Franchised Restaurant, and which may include the names "IHOP," "The International House of Pancakes" and "International House of Pancakes Restaurant," and the goodwill annexed thereto.

"Trade Secrets" means the Franchisor's Systems and secret formulae, processes, ingredients, and methods of operation, including any information concerning the business, assets, liabilities, operations, affairs, customers, products, plans or prospects of Franchisor or its Affiliate(s) which has not been made available to the public, and all studies, reports, records or other documents or materials which contain, or are prepared on the basis of, any such non-public information.

"Weekly Reporting Period" shall mean Monday through Sunday, or such other 7 consecutive day period designated by Franchisor from time to time.

II
FRANCHISED LOCATION AND EXCLUSIVE TERRITORY

2.01    Franchised Location.

(a)  Franchisor hereby grants and Franchisee hereby accepts a franchise to operate one Franchised Restaurant at the following location (hereinafter the "Franchised Location"):

115 West Southwest Loop 323
Tyler, Texas 75701

(b)    Franchisee acknowledges and agrees that selection of the Franchised Location is Franchisee's sole responsibility, and that if Franchisor shall have, in its sole and absolute discretion, provided any assistance to Franchisee in evaluating or selecting the Franchised Location, such assistance shall not be construed as a warranty, guaranty or other assurance of any kind that such Franchise Location will necessarily be a successful or profitable site.

2.02  Exclusivity.

So long as Franchisee faithfully performs and observes each and all of the obligations and conditions to be performed and observed by Franchisee under or in connection with this Agreement, Franchisor, during the Term, shall not own, operate, franchise or license any IHOP Restaurant which is located within the Franchised Area. Notwithstanding any voluntary policy which Franchisor may from time to time establish regarding the spacing of IHOP Restaurants pursuant to which it may announce its intention to forebear from locating IHOP Restaurants within certain areas surrounding the Franchised Area, Franchisee acknowledges and agrees that Franchisor, or its Affiliates, expressly reserves the exclusive and unrestricted right, in its sole and absolute discretion, now and in the future, directly and indirectly, to own, operate, franchise and license both within and outside of the Franchised Area restaurants operating under names other than "International House of Pancakes" or "IHOP," regardless of their proximity to the Franchised Restaurant, and whether or not such other restaurants offer products which are the same or similar to those which are or may be offered by the Franchised Restaurant. Nothing herein grants any exclusive rights as to the customers who may be served by Franchisee, Franchisor or its Affiliates, or by any other franchisee.

III
TERM AND RENEWAL

3.01  Initial Term.

(a)  Subject to earlier termination pursuant to the provisions of this Agreement and the conditions set forth in paragraph 3.05, the "Initial Term" of this Agreement shall commence upon the Effective Date and shall expire (check applicable provision):

[  ] ____ years after the date the Franchised Restaurant opens for business, or

[X] on February 23, 2020, which date is one day preceding the scheduled expiration date of the Master Lease, if the Franchised Location has been subleased from the Franchisor or its Affiliate, or if not, the day preceding the scheduled expiration date of Franchisee's lease or sublease with its third party landlord.



(b)  Notwithstanding anything herein to the contrary, the Term of this Agreement (and the Term of any Renewal Agreement executed pursuant to Section 3.02 and/or 3.03) shall automatically terminate (i) upon the earlier expiration or termination of, as applicable, Franchisor's or the Leasing Affiliate's Master Lease, if any, or any lease or sublease, as applicable, for the Franchised Location, or (ii) upon the occurrence of any event which prevents or prohibits Franchisee from occupying the Franchised Location or Franchised Restaurant; provided, however, that Franchisee shall not do anything which will cause such Master Lease, lease or sublease to be terminated or otherwise amended or modified without the prior written consent of Franchisor or the Leasing Affiliate, as applicable, which consent may be granted or withheld for any reason in its sole and absolute discretion.

3.02  Special Renewal Term.

(a)      If (i) the Initial Term set forth in Section 3.01 is less than 10 years; (ii) Franchisor, the Leasing Affiliate, or Franchisee, as applicable, shall have accepted any renewal, extension or New Master Lease for the Franchised Location, thereby extending the Master Lease beyond the Initial Term; (iii) Franchisee shall have agreed to pay a Deferred Initial Fee as set forth in Section 5.01(b); and (iv) Franchisee shall have satisfied in all respects the requirements and conditions set forth in Sections 3.04 through 3.06, Franchisor shall provide Franchisee with the right, but not the obligation ("Renewal Right"), to execute a new franchise agreement (the "Renewal Agreement") for a period (the "Special Renewal Term") which shall commence at the end of the Initial Term and shall terminate (subject to earlier termination as provided in Section 3.01(b)) one day prior to the expiration of the New Master Lease (but in no event for a period which when combined with the Initial Term is more than 25 years).

(b)      This Section 3.02 shall not apply (i) if this Agreement has been executed as a renewal or extension of a preexisting franchise agreement; (ii) if Franchisee has executed this Agreement in connection with its purchase of an existing franchisee's business and the existing franchisee's franchise agreement does not expressly grant a Special Renewal Term; or (iii) if "other" is checked in Recital C to this Agreement.

3.03  General Renewal Term.

(a)      If Franchisee shall have satisfied in all respects the requirements and conditions set forth in Sections 3.04 through 3.06, Franchisee shall be granted a Renewal Right upon the expiration of the Initial Term (or the Special Renewal Term, if applicable), to enter into a new franchise agreement (the "Renewal Agreement") the term of which shall commence upon the expiration of the Initial Term (or the Special Renewal Term, if applicable) and shall continue for a period of 10 years (subject to earlier termination as provided in Section 3.01(b)).

(b)      This Section 3.03 shall apply if this Agreement has been executed for a "Special Renewal Term" pursuant to Section 3.02 of Franchisee's preexisting franchise agreement, but shall not apply (i) if this Agreement has otherwise been executed as a renewal or extension of a preexisting franchise agreement (e.g., for an "Option Term" pursuant to paragraph 3.03 of Franchisee's preexisting franchise agreement, or if such preexisting franchise agreement did not otherwise expressly grant Franchisee any further right to renew); (ii)

if Franchisee has executed this Agreement in connection with its purchase of an existing franchisee's business and the existing franchisee's franchise agreement does not expressly grant a right to renew or to enter a Renewal Agreement; or (iii) if "other" is checked in Recital C to this Agreement.

### 3.04   Form and Manner of Renewal.

Franchisee shall exercise its Renewal Right, if at all, strictly in the following manner:

(a) at least 6 months but not more than 12 months before the expiration of the Initial Term of this Agreement, Franchisee shall notify Franchisor in writing ("Renewal Notice") that it intends to exercise its Renewal Right and shall request a copy of Franchisor's then-current Offering Circular, immediately upon receipt of which Franchisee shall sign and return to Franchisor the acknowledgment of receipt attached to the Offering Circular, and no sooner than 10 business days nor more than 20 business days after Franchisee receives said Offering Circular, if applicable, and execution copies of the Renewal Agreement, Franchisee shall execute the copies of said Renewal Agreement and return them to Franchisor.

(b) If Franchisee subleases the Franchised Location from Franchisor or its Leasing Affiliate, Franchisee shall execute and return to Franchisor or its Leasing Affiliate, as applicable, the form of sublease or amendment to sublease which Franchisor or the Leasing Affiliate, as applicable, shall prepare and deliver to Franchisee in accordance with Section 3.07(b), within 15 days after delivery of the same to Franchisee by Franchisor or the Leasing Affiliate.

(c) If Franchisee shall have exercised its Renewal Right in accordance with Section 3.04(a) and (b) and satisfied all of the conditions contained in Section 3.06, Franchisor shall execute the Renewal Agreement executed by Franchisee and at the expiration of the Initial Term deliver one fully executed copy thereof to Franchisee.

(d) If Franchisee fails to perform any of the acts, or deliver any of the documents required pursuant to the provisions of Sections 3.04 in a timely fashion, such failure shall be deemed an election by Franchisee not to exercise its Renewal Right and shall automatically cause Franchisee's said Renewal Right to lapse and expire, and this Agreement shall terminate at the end of the Initial Term.

### 3.05   Modification of Renewal Franchise Agreement

Notwithstanding anything herein contained to the contrary, the Renewal Agreement, if executed by parties hereto, shall differ, and be modified, from Franchisor's then-current form of franchise agreement in the following respects:

(a) Franchisee shall not be required to pay any Initial Franchise Fee; provided, however, that if Franchisor has deferred Franchisee's Initial Franchise Fee, in whole or in part, pursuant to Section 5.01(d), Franchisee, prior to execution of the Renewal Agreement, shall have paid the Deferred Franchise Fee and/or executed and delivered to Franchisor the promissory note, in accordance with Section 5.01(d);

(b) Franchisee's Continuing Royalty, National Advertising Fee and Local Advertising Fee may exceed the rates set forth in Sections 6.01, 7.01 and 7.02, respectively, depending on the rates set forth in the then current Franchise Agreement;

(c) The Term shall be deemed modified consistent with Section 3.03 (and Section 3.02, if applicable) above and either: (i) all reference to a renewal term contained in the Renewal Agreement shall be

6

deleted and Franchisee shall have no further right or option to renew or to execute any further Renewal Agreement, or (ii) if this Agreement has been executed for a Special Renewal Term, Franchisee shall be provided with one additional Renewal Right after the Special Renewal Term, as described in Sections 3.02 and 3.03.

### 3.06  General Conditions Precedent to Renewal

Franchisee's right to enter into a Renewal Agreement, in accordance with the provisions of Section 3.03 (or Section 3.02, if applicable) is conditioned upon Franchisee's fulfillment of each and all of the following conditions precedent:

(a)  At the time Franchisee delivers its Renewal Notice to Franchisor and at all times from such notification to the time of the commencement of the term of the Renewal Agreement, Franchisee shall have fully performed all of its obligations under this Agreement and under all other agreements which may then be in effect between Franchisee and Franchisor or its Affiliate, including any sublease, equipment lease, and promissory note, and each Franchisee-Affiliate shall have fully performed all of its obligations under each and every agreement between such Franchisee-Affiliate and Franchisor or its Affiliate.

(b)  At the time Franchisee notifies Franchisor of its election to renew, and at the commencement of the Renewal Agreement, Franchisee shall have not received 4 or more notices of default during any 24 month period during the Initial Term of this Agreement, whether or not such defaults were cured.

(c) If Franchisor has deferred the Initial Franchise Fee, in whole or in part, pursuant to Section 5.01(d), Franchisee shall have paid the Deferred Initial Fee and/or executed and delivered to Franchisor a promissory note providing for the payment of the Deferred Initial Fee, in accordance with Section 5.01(d).

(d)  Concurrently with Franchisee's delivery of its Renewal Notice, Franchisee shall have provided written evidence and assurance satisfactory to Franchisor of Franchisee's financial ability to refurbish and remodel the Franchised Restaurant pursuant to Section 4.03(b), and prior to the expiration of the Initial Term, Franchisee, at its sole expense, shall have completed refurbishing and remodeling the Franchised Restaurant, pursuant to Section 4.03(b), shall have repaired the Franchised Restaurant so that it is in first class condition and repair pursuant to Section 4.03(a), and shall have otherwise brought it into conformity with Franchisor's specifications and standards, as respects building design, furniture, fixtures, signs, equipment and color schemes, as are then applicable for new franchises being granted by Franchisor for the operation of IHOP Restaurants;

(e)  Franchisee shall have renewed or extended its lease or sublease, or executed a new or amended lease or sublease, pursuant to which Franchisee shall have secured the right to continue to occupy the Franchised Location after the expiration of the Initial Term and throughout the Renewal Term.

(f) At the time Franchisee delivers its Renewal Notice to Franchisor and at all times from and after such notification to the time of the commencement of the term of the Renewal Agreement, Franchisee shall meet the then-current standards set by Franchisor  for issuing new franchises to existing franchisees.

### 3.07  No Duty by Franchisor to Renew Master Lease

(a)  Franchisee acknowledges that its right to enter into a Renewal Agreement, and the continuation of the Term of the Franchise Agreement, shall be subject to the continuation of Franchisee's right to occupy

the Franchised Location. If Franchisee's Location is leased or subleased by Franchisee from a third party, it shall be Franchisee's sole responsibility to maintain its lease or sublease for the Franchised Location in full force and effect. If Franchisee subleases the Location from the Franchisor or its Leasing Affiliate, neither Franchisor nor its Leasing Affiliate shall be obligated to exercise any renewal right or option available to it under the Master Lease, or otherwise, and any decision to exercise any option to renew or extend the Master Lease may be exercised in its sole and absolute discretion. If Franchisor or such Leasing Affiliate shall decide not to renew or exercise any said option to renew, it may in its sole discretion (if and to the extent permitted to do so under its Master Lease) assign any such renewal right or option to Franchisee who may exercise it in its own name and behalf; provided, however, that Franchisor shall not be required to continue, assume, or undertake, any continuing liability with respect to the lease for the Franchised Location, whether as assignor, signatory or guarantor, and it shall be Franchisee's exclusive responsibility to provide such guarantees, security or other financial assurances as may be acceptable to the lessor. Any such option (if exercised) or renewal, extension or new Master Lease (if accepted by Franchisor or the Leasing Affiliate, as applicable) shall be referred to herein as the "New Master Lease."

(b) Should Franchisor or the Leasing Affiliate, as applicable, as a condition to or in consideration for the New Master Lease, be required to or otherwise agree to increases in base rental, percentage rental, taxes and/or "other expenses" in excess of those previously required of Franchisee as lessee, under the Master Lease, Franchisor or the Leasing Affiliate, as applicable, shall have the right to increase in a like dollar amount, any, all, or any combination of the base rental, percentage rental, taxes and/or "other expenses", respectively, to be paid by Franchisee to Franchisor or the Leasing Affiliate pursuant to the sublease or amendment to sublease to be executed by Franchisee under Sections 3.04(b) and 3.06(e), respectively. Any such increase(s) in Franchisee's base rental, percentage rental, taxes and/or "other expenses" shall be equal in dollar amount to the increase(s) therein required of Franchisor or the Leasing Affiliate, as applicable, as lessee in connection with the New Master Lease. By way of illustration, if the original Master Lease called for a minimum monthly rental of $1,000.00, and the New Master Lease called for a minimum monthly rental of $2,000.00, with no change in the amount of percentage rental, the Franchisee's sublease minimum rental would increase by $1,000.00 per month payable on a weekly basis. "Other expenses" may include a onetime payment to Franchisor's or the Leasing Affiliate's Master Landlord in consideration for the New Master Lease, new or increased administrative fees or common area maintenance charges, and/or capital expenditures or expenses for remodelling, refurbishment, expansion, renovation, repair or decoration of the interior, exterior or surrounding areas of the Franchised Location. Any such obligations shall be in addition to those required under Section 3.06(d) above; in the event of any conflict between work to be performed under Section 3.06(d) on the one hand, and this Section 3.07(b), on the other hand, the resolution thereof shall be determined by Franchisor or the Leasing Affiliate, as applicable, in its sole and absolute discretion.

3.08 Notice of Expiration Required by Law.

If Applicable Law requires that Franchisor give notice to Franchisee prior to the expiration of the Term, this Agreement shall remain in effect on a week-to-week basis until Franchisor has given the requisite notice required by such Applicable Law. Notwithstanding anything herein to the contrary, if Franchisor is not offering new franchises or is otherwise not lawfully able to offer Franchisee its then-current form of Franchise Agreement at the time Franchisee elects to renew, Franchisor may, at its option, agree to renew this Agreement on its current terms, or extend the term hereof until it is lawfully able to offer its then-current form of franchise agreement.

IV
## RESTAURANT CONSTRUCTION AND REFURBISHING

4.01  Standard Plans and Specifications.

(a) If the Franchised Restaurant has not been constructed as of the Effective Date, Franchisor or its Affiliate shall furnish to Franchisee, at no additional charge to Franchisee, Franchisor's standard plans and specifications for the erection of an IHOP Restaurant and for equipment and signs, but excluding site plans. Franchisee shall, at its sole cost and expense, prepare site plans, and make such modifications to Franchisor's standard plans and specifications, as may be required to construct the Franchised Restaurant and the entire Franchised Location in conformity with Applicable Law.  Franchisee shall not make or allow any change or addition to be made in or to the plans or specifications furnished by Franchisor or its Affiliate without Franchisor's or its Affiliate's, as applicable, prior written consent and approval, which consent and approval shall not be unreasonably withheld.  Unless waived by Franchisor in its sole subjective discretion, upon completion of the construction, and prior to opening, Franchisee shall cause its architect to provide to Franchisor a certification that the building was built in accordance with plans previously submitted and approved by Franchisor and that the plans as submitted to IHOP comply with all applicable laws and codes.

(b) If the Franchised Restaurant is to be converted to an IHOP Restaurant by Franchisee, Franchisor or its Affiliate will furnish to Franchisee, at no cost to Franchisee, Franchisor's standard plans and specifications for the construction of an IHOP Restaurant and for equipment and signs, and/or remodel specifications for the conversion of a restaurant.  Franchisee shall, at its sole cost and expense, adapt the standard plans to the particular site in conformity with Franchisor's standard plans, prepare site plans and submit the same to Franchisor or its Affiliate for its written approval. Any further modifications to the plans or deviations from the provided plans and specifications are subject to the prior written approval of Franchisor or its Affiliate, as applicable.  Unless waived by Franchisor in its sole subjective discretion, upon completion of the construction, and prior to opening, Franchisee shall cause its architect to provide to Franchisor a certification that the building was converted in accordance with plans previously submitted and approved by Franchisor and that the plans as submitted to IHOP comply with all applicable laws and codes.

4.02  Construction (Check if applicable):

[ ]    (a) If the Franchised Restaurant has not been constructed as of the Effective Date, Franchisee shall, at its sole cost and expense, acquire the Franchised Location through purchase or lease, and promptly erect, or cause to be erected, an IHOP Restaurant on the Franchised Location which conforms to the plans and specifications furnished to Franchisee, pursuant to Section 4.01(a).  Franchisee shall break ground for construction of the Franchised Restaurant, and thereafter shall use its best efforts promptly to complete construction and have all fixtures, furnishings, machinery and equipment installed, parking areas completed, inventory delivered, business and other permits obtained, personnel employed and all other necessary things attended to so that the Franchised Restaurant shall be open for business to the public as expeditiously as possible, but by no later than _____.

[ ]    (b) If the Franchised Restaurant is to be converted to an IHOP Restaurant by Franchisee, Franchisee shall, at its sole cost and expense, acquire the Franchised Location through purchase or lease, and promptly convert the restaurant building on the Franchised Location in conformity with the specifications furnished to Franchisee pursuant to paragraph 4.01(b) above.  Franchisee shall use its best efforts promptly to complete the conversion of the Franchised Restaurant so that the same shall be open for business to the public by no later than _____.

(c) If either Section 4.02 (a) or (b) is checked, Franchisee shall provide Franchisee with comprehensive information regarding all phases of the development process of the Franchised Location as Franchisor may require, and weekly progress reports during construction, in a format designated by Franchisor. Such information shall include, without limitation, the name, telephone number,  and address of the architect, civil engineer, surveyor, general contractor, and environmental consultant, and the primary contact for each, copies of all permits, and digital photographs, and shall be submitted to Franchisor via hard copy, electronically including subscribing to a web based construction tracking service, or by such other means as Franchisor may designate.

(d) If this Agreement has been signed under the Single Store Development Program, notwithstanding anything to the contrary contained in Section 4.02 (a) or 4.02 (b), Franchisee may, at its option, forestall the termination of this Agreement by Franchisor caused by Franchisee's failure to open the Franchised Restaurant by the date set forth in Section 4.02 (a) or (b), provided Franchisee has broken ground and commenced construction by the date set forth in Section 4.02(a) or 4.02(b), by providing Franchisor with written notice of Franchisee's request for additional time, specifying the amount of additional time requested, which in no event shall exceed 60 days, and by paying to Franchisor the sum of $350.00 per day ("Delayed Development Fee") in advance with said written notice, for each day (in whole or in part) for which the extension of time is requested, provided, however, if Franchisee shall have failed to open the Restaurant within 60 days after the date set forth in Section 4.02(a) or (b), or to pay the Delayed Development Fee for the extended period, then such failure shall constitute a material breach of this Agreement pursuant to Section 12.02.

4.03  Maintaining and Refurbishing of Franchised Restaurant.

(a) Franchisee shall at all times during the Term hereof maintain at its sole expense the interior and exterior of the Franchised Restaurant and the entire Franchised Location, including the parking lot and the point of sale system, in first class condition and repair, and in compliance with all Applicable Laws and Operations Bulletins, except to the extent Franchisor may otherwise expressly agree in writing.

(b) Except as otherwise provided herein, every 5 years during the entire Term hereof, at Franchisee's sole cost and expense, Franchisee shall refurbish, remodel and improve the Franchised Restaurant in accordance with Franchisor's then current standards as set forth in the Operations Bulletins or as otherwise promulgated by Franchisor and provided to Franchisee. Franchisee shall commence the first such refurbishing, remodelling and improving [check one] [   ] on _____, or [X] on the anniversary date occurring 5 years from the Effective Date.  Each subsequent refurbishing, remodelling and improving shall commence 5 years from the date on which the last such refurbishing, remodelling and improving was commenced.  Franchisee shall complete any such refurbishing, remodelling and improving as expeditiously as possible, but in any event within 30 days after commencing same.  This refurbishment and remodel requirement is in addition to and does not include the maintenance obligations set forth in Section 4.03(a) above. 

(c) Franchisor or its Affiliate may, on one or more occasions, waive or defer for such period of time as Franchisor may deem appropriate, Franchisee's obligation to refurbish, remodel and improve an IHOP Restaurant.

4.04  Lease Requirements and Franchisor's Succession Rights.

(a) If Franchisee leases the Franchised Location or the Franchised Restaurant from a third party, the lease shall expressly provide, by lease addendum in a form prescribed by IHOP, unless Franchisor  modifies

or waives these requirements in writing, that (i) in the event of any breach or claim by the Landlord thereunder of any breach by Franchisee, said Landlord shall be obligated to notify Franchisor in writing at least 30 days prior to the termination of said lease, whereupon Franchisor or an Affiliate shall have the right, but not the obligation, to cure such breach and succeed to Franchisee's rights thereunder, and (ii) in the event of the termination of this Agreement as a result of Franchisee's breach hereof, and upon Franchisor's or such Affiliate's written election to Franchisee to be made within 10 days after the date of said termination, Franchisor or its Affiliate shall have the right to succeed to Franchisee's rights under the lease. If Franchisor or such Affiliate elects to succeed to Franchisee's rights under the lease, as aforesaid, Franchisee shall assign to Franchisor or such Affiliate all of its right, title and interest in and to said lease, whereupon the Landlord thereunder shall attorn to Franchisor or such Affiliate as the tenant thereunder. Franchisee shall execute and deliver to Franchisor or such Affiliate such assignment and take such further action as Franchisor or such Affiliate, as applicable, in its sole and absolute discretion, may deem necessary or advisable to effect such assignment, within 10 days after written demand by Franchisor or such Affiliate to do so, and upon Franchisee's failure to do so, Franchisor or such Affiliate shall be, and hereby is, appointed Franchisee's attorney in fact to do so. This power of attorney granted by Franchisee to Franchisor or such Affiliate is a special power of attorney coupled with an interest and is irrevocable and shall survive the death or disability of Franchisee. Any sum expended by Franchisor or such Affiliate to cure Franchisee's breach of the lease shall be deemed additional sums due Franchisor or its Affiliate hereunder and Franchisee shall pay such amount to Franchisor or its Affiliate upon demand. The covenants of Franchisee contained in this Section 4.04(a) shall survive the termination of this Agreement.

(b) Franchisee shall deliver to Franchisor a complete copy of such lease promptly after execution thereof by Franchisee and the Landlord in the form previously approved by Franchisor. Franchisee shall duly and timely perform all of the terms, conditions, covenants and obligations imposed upon him or her under the lease for the Franchised Location.

V
INITIAL FRANCHISE FEE

5.01  Initial Franchise Fee (check as applicable):

[ ]       (a) If this Agreement has been signed under the Purchase Program, Franchisee shall pay to Franchisor the sum of $_____, as an Initial Franchise Fee; payable $_____ upon the execution of this Agreement, and the balance, if any, in _____ equal weekly installments with interest on the unpaid balance at the rate of _____% per annum (or the maximum rate allowed by law, whichever is lower), evidenced by a promissory note on the form prescribed by Franchisor. The first payment on the balance shall be due on the second Wednesday following the date the Franchised Restaurant opens for business with subsequent payments due on each succeeding Wednesday until paid in full.

[ ]       (b) If the Initial Term under the Purchase Program set forth in Section 3.01(a) is less than 10 years, and Franchisee is entitled to a Special Renewal Term pursuant to Section 3.02, Franchisee shall also pay, as a condition precedent to Franchisee's right to enter into a Renewal Agreement pursuant to Section 3.02, and in addition to the Initial Franchise Fee payable pursuant to Section 5.01(a), a "Deferred Initial Fee" equal to $_____ for each year of the First Renewal Term (not to exceed a total of $_____); which Deferred Initial Fee shall be payable $_____ at the time Franchisee executes its Renewal Agreement pursuant to Sections 3.02 and 3.04, and the balance, if any, in _____ equal consecutive weekly installments with interest on the unpaid balance at the rate of _____% per annum (or the maximum rate allowed by law, whichever is lower), evidenced by a promissory note on the form prescribed by Franchisor.

[ ]    (c) If Franchisee is executing this Agreement pursuant to the Single Store Development Program under which you paid a location fee ("Location Fee"), Franchisee shall pay to Franchisor the sum of $50,000.00 as an Initial Franchise Fee, less the Location Fee of $15,000.00 paid for the Franchised Location, payable upon execution of this Agreement.

[ ]    (d) If Franchisee is executing this Agreement pursuant to the terms of an executory IHOP Multi-Store Development Agreement pursuant to which you paid a development fee ("Development Fee"), Franchisee shall pay to Franchisor the sum of $40,000.00, less the Development Fee of $20,000.00 paid for this Franchised Location, payable upon execution of this Agreement.

[ ]    (e) If this Agreement has been signed under the Novation Program, or in connection with the renewal or assignment of a preexisting franchise agreement for the Franchised Location, there shall be no Initial Franchise Fee payable pursuant to the execution of this Agreement, but any balance which remains unpaid in respect of the franchise fee previously incurred by Franchisee (or its assignor, if applicable) shall remain payable on the terms previously agreed, as shall the general account balance and other obligations then owed to Franchisor by Franchisee (or its assignor, if applicable).

[ ]    (f) If Franchisee is executing this Agreement pursuant to the terms of an executory IHOP Area Development Agreement for a Franchised Location within the Exclusive Territory defined therein, there shall be no additional Initial Franchise Fee payable pursuant to the execution of this Agreement, but any balance which remains unpaid in respect of the franchise fee previously incurred by Franchisee pursuant to the Area Development Agreement shall remain payable on the terms previously agreed, as shall Franchisee's other obligations to Franchisor.

[X]    (g) If "other" is checked in Recital C to this Agreement, the Franchisee shall pay to Franchisor the sum of $50,000 as an Initial Franchise Fee; payable $10,000.00 upon execution of this Agreement, and the balance, if any, in 156 equal weekly installments with interest on the unpaid balance at the rate of 11% per annum (or the maximum rate allowed by law, whichever is lower), evidenced by a promissory note on the form prescribed by Franchisor. The first payment on the balance shall be due on the second Wednesday following the Effective Date of this Franchise Agreement with subsequent payments due on each succeeding Wednesday until paid in full.

VI
CONTINUING ROYALTY, DEFINITION OF
GROSS SALES AND RECORD KEEPING

6.01 <u>Continuing Royalty</u>.

Each week during the Term, Franchisee shall pay to Franchisor a Continuing Royalty in an amount equal to:

[X]    (a) 4.5% of Franchisee's Gross Sales during the preceding Weekly Reporting Period, or

[ ]    (b) The percentage of Franchisee's Gross Sales set forth in the schedule attached hereto, for the first _____ Weekly Reporting Periods following the Effective Date, and thereafter 4.5% of Franchisee's Gross Sales for the balance of the Term.

6.02 <u>Payments and Reporting</u>.

(a) The Continuing Royalty payment for each Weekly Reporting Period shall be due on the Wednesday following the Weekly Reporting Period in which such Gross Sales were earned, and shall be accompanied, where applicable, by any installment payments due pursuant to Section 5.01.

(b) Franchisee's weekly Continuing Royalty payments shall be accompanied by a statement in such form and detail as Franchisor shall from time prescribe, showing how such Continuing Royalty was computed for such Weekly Reporting Period, and accompanied by the cash register or all electronic point-of-sale system tapes of the Franchised Restaurant for the same period.

(c) On a monthly basis, Franchisee shall submit to Franchisor a copy of Franchisee's monthly sales tax reports.

(d) Within 30 days after the expiration of each calendar quarter (or other 3 month period designated by Franchisor), Franchisee shall furnish Franchisor with a profit and loss statement of the Franchised Restaurant for such previous quarter and within 90 days after the end of each calendar year, Franchisee shall furnish Franchisor with a profit and loss statement and balance sheet of the Franchised Restaurant for the previous calendar year. All such financial statements shall be prepared in accordance with Generally Accepted Accounting Principles ("GAAP") consistently applied from applicable period to period and shall be certified by Franchisee, or by Franchisee's Chief Executive Officer or Chief Financial Officer, if Franchisee is a Business Entity, as being true and correct, and as being prepared in accordance with GAAP consistently applied from applicable period to period. All such financial statements shall also comply with any specific requirements as Franchisor may from time to time designate. Franchisee hereby irrevocably consents to the inspection of said financial statements by Franchisor or its Affiliate and to Franchisor's use of said financial statements, at Franchisor's election, in Franchisor's offering circular for the offer and sale of franchises. Franchisee shall submit all such financial statements to Franchisor by such means, including electronically, as Franchisor may designate from time to time.

(e) If Franchisee should at any time cause an audit of Franchisee's business to be made by a public accountant, Franchisee shall furnish Franchisor with a copy of said audit, without any cost or expense to Franchisor.

(f) Franchisee shall allow Franchisor and its Affiliate access to, and upon request shall provide copies of, the Franchisee's state, federal and local income tax returns and Franchisee hereby waives any privilege pertaining thereto.

(g) Upon request of Franchisor, Franchisee must participate in Franchisor's then-current electronic funds transfer program authorizing Franchisor to receive payments from Franchisee by pre-authorized bank draft, wire transfer, automated clearinghouse (ACH) transfer, or otherwise, as Franchisor specifies from time-to-time in Franchisor's sole and absolute discretion, in accordance with procedures that may be set forth in the Operations Bulletins.

6.03 <u>Records</u>.

(a) Franchisee shall record all sales in such form and manner, and using such equipment, as prescribed in the Operations Bulletins, which may, among other things, require Franchisee to use individual pre-printed machine serial numbered guest checks bearing the "IHOP" logo and advertising slogan, which Franchisee must purchase from a Franchisor-approved, licensed vendor. Franchisee shall cause all such sales to be registered

upon an electronic point-of-sale system, of such type and having such features as specified by Franchisor, and which may require a lock-in running total. At any time upon Franchisor's request, Franchisee shall provide to Franchisor or its authorized representatives access, and if applicable a key to permit reading of, the running total of the point-of-sale system. Any electronic point-of-sale system must at all times meet each and all of Franchisor's standard specifications and requirements then in effect for same.

(b) Franchisee shall keep and preserve for a period of not less than 36 months after the end of each calendar year or any longer period as may be required by Applicable Law, such business records as may be prescribed by Franchisor, including cash register receipts, cash register tape readings, standardized numbered guest checks, sales tax or other tax returns, bank books, duplicate deposit slips, and other evidence of Gross Sales and business transactions in accordance with Franchisor's requirements promulgated from time to time. In addition to the rights granted Franchisor under Section 10.07, Franchisor and its Affiliate shall have the right, at any time and from time to time, to enter Franchisee's Franchised Restaurant and other business offices to inspect (including the right to inspect point-of-sale systems, and other equipment, as applicable, and to take readings of all documenters, pre-checkers and point of sale systems), audit, verify sales and make or request copies of books of account, bank statements, documents, records, tax returns, papers and files of Franchisee relating to Gross Sales and business transacted and, upon request by Franchisor, Franchisee shall make any such materials available for inspection by Franchisor and its Affiliate at the Franchised Restaurant or at Franchisee's other business offices as specified by Franchisor. Such audit and/or sales verification may include the on-site presence of one or more personnel of Franchisor or its Affiliate for 7 full consecutive days. If Franchisor should cause an audit to be made and the Gross Sales business transacted and payments due to Franchisee as shown by Franchisee's statements should be found to be understated or unpaid by any amount, Franchisee shall immediately pay to Franchisor or its Affiliate, if applicable, the additional amount payable as shown by such audit, plus interest thereon at the highest rate of interest allowed by law, and if they are found to be understated by 2% or more, or if records are not produced as requested by Franchisor, Franchisee shall also immediately pay to Franchisor the cost of such audit and any subsequent audit and/or sales verification that may be performed due to Franchisee's prior failure to produce records; otherwise, the cost of the audit shall be paid by Franchisor.

(c) Upon request by Franchisor, Franchisee shall electronically link its Franchised Restaurant to Franchisor or its Affiliate, and allow Franchisor and/or its Affiliate, to poll the Franchised Restaurant on a daily or other basis at such times and in such manner as established by the Franchisor or its Affiliate, with or without notice, through the computerized POS system and to retrieve such transaction information including sales, sales mix, usage, and other operations data as Franchisor and/or its Affiliate deems appropriate. Franchisee shall, at its sole cost and expense, obtain and maintain a separate dedicated telephone line and modem, or if available and approved by IHOP, such other means of making such information available electronically, such as the internet via a broadband connection, as Franchisor or its Affiliate may specify from time to time.

## VII
## ADVERTISING

### 7.01 National Advertising Fee.

(a) In addition to all other payments provided for herein, each week during the Term, Franchisee shall pay to Franchisor a National Advertising Fee equal to 1% of the Gross Sales of the Franchised Restaurant, payable on the Wednesday following the Weekly Reporting Period in which such Gross Sales were earned (simultaneously with Franchisee's Continuing Royalty payment for the same period).

(b) National Advertising Fees paid by Franchisee shall be administratively segregated on Franchisor's or its Affiliate's books and records (the "National Advertising Fund"), together with the aggregate of:

(i) National Advertising Fees payments made by all franchisees of IHOP Restaurants;

(ii) Payments equal to 1% of the Gross Sales of IHOP Restaurants operated by Franchisor and its Affiliates; and

(iii) All Table Allowances received by Franchisor or its Affiliates.

(c) From sums available in the National Advertising Fund, Franchisor shall develop advertising, public relations, and promotional campaigns designed to promote and enhance the image, identity or patronage of all IHOP Restaurants. In addition, should sufficient sums be available in the National Advertising Fund, Franchisor may, but is not obligated to, make expenditures from the National Advertising Fund for the purpose of paying for advertising, public relations and promotional campaigns designed to promote and enhance the image, identity or patronage of all IHOP Restaurants. Permissible expenditures may include conducting marketing studies, purchasing computer software and hardware to facilitate customer and marketing analysis or advertising generally, and the production and purchase of advertising art, commercials, musical jingles, print advertisements, point of sale materials, media advertising, outdoor advertising art, and direct mail pamphlets and literature. It is expressly agreed that in all phases and aspects of such activities, including cost, development, type, format and style, quantity, timing, placement, choice of media or agency, and all other matters relating to such advertising, public relations and promotional activities, the decision of Franchisor shall be final. Nothing herein shall be construed to require Franchisor to allocate or expend National Advertising Fund contributions so as to benefit any particular franchisee or group of franchisees on a pro rata or proportional basis or otherwise. The National Advertising Fund shall not be a trust fund and shall be commingled with Franchisor's other funds. Franchisee shall not engage in any such activities, nor shall it erect or display any sign or notice of any kind without the prior written consent of Franchisor, whose decisions shall be final.

(d) Such advertising, public relations, and promotional services shall be provided and administered as follows:

(i) Franchisor shall consult with franchisees at regularly scheduled meetings concerning the type, content, frequency, development and nature of proposed National Advertising Programs, and shall give due consideration to the views of franchisees. The allocation of advertising expenditures from the National Advertising Fund shall be finally determined by Franchisor.

(ii) Franchisor shall disburse funds from the National Advertising Fund for the purpose of paying for its actual administrative expenses with respect to said Fund, its reimbursement of direct costs incurred by its Affiliate in providing administrative services respecting the National Advertising Fund and costs of Franchisor's internal Advertising Department, including direct overhead and excluding any costs relating to Franchisor's Franchise Sales Program. To the extent the Franchisor's Affiliate provides administrative services for the direct benefit of the National Advertising Fund and incurs expenses as a result thereof, such expenses will be reimbursed from the National Advertising Fund. Additionally, Franchisor shall disburse funds from the National Advertising Fund for the purpose of paying for the other expenses hereinabove set forth in paragraph 7.01(c).

(iii) Within a reasonable time after the expiration of each of Franchisor's fiscal years, Franchisor shall furnish franchisees information with respect to the receipts and expenditures of monies by and from the National Advertising Fund, containing the following information:

(1) The opening balance in such Fund at the beginning of such fiscal year;

(2) The total amount of fees paid into the National Advertising Fund by all franchisees during such fiscal year;

(3) The total amount of Table Allowances received by Franchisor and its Affiliates during such fiscal year;

(4) A reasonably itemized breakdown and description of all disbursements from the National Advertising Fund during such preceding fiscal year, sufficient to indicate separately each of the various classes of expenditures made from such Fund and the amount of the expenditures made for each class thereof; and

(5) The net balance, if any, remaining in the National Advertising Fund at the close of such fiscal year.

If Franchisor's National Advertising Fund expenditures in any one fiscal year shall exceed the total amount contributed to said Fund during said fiscal year, Franchisor shall have the right to be reimbursed to the extent of the excess of those amounts subsequently contributed to said Fund. If the contributions to said Fund exceed the expenditures from such Fund in any fiscal year, such excess will be retained in said Fund for future advertising.

7.02  Local and Regional Advertising Fee.

(a) In addition to all other payments provided for herein, each week during the Term, Franchisee shall pay to Franchisor a Local Advertising Fee equal to 2% of the Gross Sales of the Franchised Restaurant, payable on the Wednesday following the Weekly Reporting Period in which such Gross Sales were earned (simultaneously with Franchisee's Continuing Royalty  and National Advertising Fee payment for the same period).

(b) Franchisees or Franchisor may, from time to time, develop or assist in the development of Regional Advertising cooperatives designed to promote and enhance the value of all IHOP Restaurants in each region. Franchisor may establish and modify from time to time guidelines and procedures which shall govern the conduct and operation of the Regional Advertising Cooperatives. The geographical description of each region (hereinafter "Advertising Region") shall be designated by Franchisor in its sole subjective judgment, exercised in good faith, after consultation with franchisees in the proposed Advertising Region.  If a majority of the Franchised Restaurants in the Advertising Region vote to establish or participate in a Regional Advertising Cooperative (each IHOP Restaurant being entitled to one vote), Franchisee's Franchised Restaurant and all IHOP Restaurants operated by Franchisor and its Affiliates and located in the Advertising Region shall participate therein and contribute thereto on an equal basis with all other franchisees who are obligated to, or if applicable, voluntarily elect to, participate in such Regional Advertising Cooperative.  Each franchisee in the proposed Advertising Region shall be entitled to vote in person at a meeting called for the purpose of considering formation of a Regional Advertising Cooperative, or by ballot submitted to Franchisor in writing within 30 days thereafter.

## VIII
## TRADEMARKS AND TRADE SECRETS

8.01  License to Use Trademarks.

(a) Franchisor hereby grants to Franchisee, and Franchisee hereby accepts, the right, during the Term hereof, upon the terms and conditions contained herein, to use and display the Trademarks, but only in connection with the retail sale at the Franchised Restaurant of those items contained on the standard menu of IHOP Restaurants as prescribed by the Operations Bulletins.

(b) Nothing herein shall give Franchisee any right, title or interest in or to the Trademarks, except a mere privilege and license, during the Term hereof, to display and use the same according to the foregoing limitations and upon the terms, covenants and conditions contained herein.

8.02  Acts in Derogation of Franchisor's Trademarks.

(a) Franchisee agrees that, as between Franchisor and Franchisee, the Trademarks of Franchisor are the sole and exclusive property of Franchisor and Franchisee now asserts no claim and will hereafter assert no claim to any goodwill, reputation or ownership thereof by virtue of Franchisee's licensed use thereof. Franchisee agrees that it will not do or permit any act or thing to be done in derogation of any of Franchisor's rights in connection with the same, either during the Term or thereafter, and that it will use same only for the uses and in the manner licensed hereunder and as herein provided.

(b) Except to the limited extent expressly licensed hereunder, Franchisee shall not use, or permit the use, as part of its name, the phrases "IHOP", "International House of Pancakes", "House of Pancakes", or any phrase or combination of words confusingly similar thereto.

8.03  Prohibition Against Disputing Franchisor's Rights.

Franchisee agrees that it will not, during or after the Term, in any way, dispute or impugn the validity of the Trademarks licensed hereunder, or the rights of Franchisor thereto, or the right of Franchisor, its Affiliates, or other franchisees of Franchisor to use the same both during the Term and thereafter.

8.04  Use of Franchisor's Name.

Franchisee agrees that the Franchised Restaurant shall be named "IHOP," "International House of Pancakes" or "International House of Pancakes Restaurant," as specified by Franchisor or any combination thereof as may be approved by Franchisor in its sole discretion, without any suffix or prefix attached thereto and all signs, advertising and slogans will only bear the name "IHOP," "International House of Pancakes", or "International House of Pancakes Restaurant," or such other Trademarks as Franchisor may hereafter specify in its Operations Bulletins.  Franchisee shall maintain a plaque of reasonable and suitable size and design, as approved by Franchisor, behind the cash register on the interior of the premises, designating Franchisee as proprietor of the Franchised Restaurant, and shall use Franchisee's correct name on all invoices, orders, vouchers, checks, letterheads, and other similar materials, identifying the franchise as being a franchise of Franchisor which is independently owned and operated by Franchisee.

(c) From Franchisee's Local Advertising Fee, but only to the extent that such fee actually has been paid by Franchisee to Franchisor during Franchisor's fiscal year then in progress, Franchisor shall reimburse Franchisee or credit Franchisee's account with Franchisor, for: (i) Franchisee's Franchisor-approved local advertising expenses incurred during said fiscal year (after deducting any expenses that Franchisor has previously paid or is or may be required to pay on account of advertising run by, for, or on behalf of Franchisee), and, (ii) contributions made by Franchisee during said fiscal year (whether through payment to Franchisor or directly to a third party) to the Regional Advertising Cooperative, if any, of which Franchisee is a member, for advertising of the Franchised Restaurant; provided, however, that the combined amount of Franchisor's said reimbursements for any of its fiscal years pursuant to (i) and (ii) shall in no event exceed the Local Advertising Fee actually paid by Franchisee during said fiscal year, and such right of reimbursement shall be subject to the condition that Franchisee furnish Franchisor with appropriate verification, satisfactory to Franchisor, of such advertising expenditures and that the advertising resulting therefrom has been placed and paid for either by Franchisee or the Regional Advertising Cooperative of which Franchisee is a member and that no liability to any party exists or may exist with respect to such advertising. Local Advertising Fees which are contributed in a particular fiscal year of Franchisor, but which Franchisor is not required to reimburse or credit on account of advertising expenditures incurred by Franchisee during said fiscal year, shall become part of Franchisor's general operating funds.

7.03 General Advertising Requirements.

(a) Franchisee shall conduct all local advertising and promotion in accordance with such policies and provisions with respect to format, content, media, geographic coverage and other criteria as are from time to time contained in the Operations Bulletins, or as otherwise directed by Franchisor, and shall not use or publish any advertising material which does not conform to said policies and provisions or as to which Franchisee shall not have received Franchisor's prior written approval; provided, however, that if Franchisor shall not object to any proposed advertisement submitted by Franchisee for approval within 20 days after Franchisor's receipt thereof, such advertisement shall be deemed approved subject to Franchisor's right to subsequently withdraw its approval.

(b) Franchisee may not develop, create, generate, own, license, lease or use in any manner any computer medium or electronic medium (including any internet home page, website, bulletin board, newsgroup or other internet-related medium) which in any way uses or displays the Trademarks, in whole or part, and Franchisee shall not cause or allow the Trademarks, or any of them, to be used or displayed in whole or part, as an internet domain name, or on or in connection with any internet home page, website, bulletin board, newsgroup or other internet-related activity without Franchisor's express prior written consent, and then only in such manner and in accordance with such procedures, policies, standards and specifications as Franchisor may establish.

(c) Franchisor may (but is not required to) develop an Intranet network through which Franchisor and its franchisees (including Franchisee) can communicate by e-mail or similar electronic means and through which Franchisor may disseminate updates to the System and other confidential information. If Franchisor develops such an Intranet network, Franchisee agrees to use the facilities of the Intranet in strict compliance with the System, and with such procedures, policies, standards and specifications as Franchisor may establish from time to time (including, without limitation, standards, protocols and restrictions relating to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements). If Franchisor shall develop said Intranet, Franchisor shall have no obligation to maintain the Intranet, and may discontinue its use at any time without liability to Franchisee.

8.05  Trademark Protection.

In the event that any third party makes any claim, by suit or otherwise, against Franchisee because of Franchisee's use in accordance with this Agreement of the Trademarks, Franchisee shall immediately notify Franchisor in writing.  After receipt of said notice, Franchisor shall promptly take such action as may be necessary to protect and defend Franchisee against any such claim, suit or demand, and Franchisor shall protect, indemnify and save Franchisee harmless from any loss, costs or expenses arising out of or relating to any such claim, demand or suit.  Franchisee shall have no right to settle, compromise,  or litigate any such claim except in strict compliance with any specific directives provided by Franchisor relating to such specific claim. Franchisor shall have the right to defend, compromise or settle any such claim at Franchisor's sole cost and expense, using attorneys of its own choosing, and Franchisee shall cooperate fully with Franchisor in connection with the defense of any such claim.

8.06  Prosecution of Infringers

If Franchisee shall receive notice or is informed or learns that any third party, which it believes to be unauthorized to use the Trademarks, is using the Trademarks or any variant thereof, Franchisee shall promptly notify Franchisor of the facts relating to such alleged infringing use.  Thereupon, Franchisor shall determine whether or not it wishes to take any action against such third person on account of such alleged infringement of Franchisor's Trademarks.  Franchisee shall have no right to make any demand against any such alleged infringer of Franchisor's Trademarks or to prosecute or require Franchisor to prosecute any claim of any kind or nature whatsoever against such alleged infringer of Franchisor's Trademark for or on account of such infringement.

8.07  Modification of Trademarks

From time to time, in the Operations Bulletins, Franchisor may add to, delete or modify any or all of the Trademarks.  Franchisee shall accept, use, or cease using, as may be applicable, the Trademarks, including any such modified or additional trade names, trademarks, service marks, logotypes and commercial symbols, in accordance with the procedures, policies, rules and regulations contained in the Operations Bulletins, as though they were specifically set forth in this Agreement.

8.08  License to Use Trade Secrets.

(a) Franchisor hereby grants to Franchisee, and Franchisee hereby accepts, the right, during the Term hereof, upon the terms and conditions contained herein, to use Franchisor's Trade Secrets, but only in connection with the retail sale at the Franchised Restaurant of those items contained on the standard menu of IHOP Restaurants as prescribed by the Operations Bulletins.

(b) Franchisor will disclose certain of its Trade Secrets to Franchisee in the Operating Bulletins, confidential correspondence, or other confidential communications, and through the Franchisor's training program and other guidance and management assistance, and in performing Franchisor's other obligations and exercising Franchisee's rights under this Agreement.  Franchisee acknowledges that the Trade Secrets now and hereafter provided or revealed pursuant to this Agreement are revealed in confidence and Franchisee expressly agrees to keep and respect the confidence so reposed.

(c) Franchisee shall acquire no interest in the Trade Secrets other than the right to use them in developing and operating the Franchised Restaurant during the Term.  Franchisee's duplication or use of the Trade Secrets in any other endeavor or business shall constitute an unfair method of competition.  Franchisee

shall: (i) not use the Trade Secrets in any business or other endeavor other than in connection with the Franchised Restaurant; (ii) maintain absolute confidentiality of the Trade Secrets during and after the Term; (iii) make no unauthorized copy of any portion of the Trade Secrets, including the Operating Bulletins, confidential correspondence, or other confidential communications, whether written or oral; and (iv) operate and implement all reasonable procedures prescribed from time to time by Franchisor to prevent unauthorized use and disclosure of the Trade Secrets, including restrictions on disclosure to Owners and others who may have access to the Operations Bulletins, or any of the Trade Secrets, and, at Franchisor's request, Franchisee shall cause such persons to execute confidentiality agreements on a form prescribed by Franchisor. Promptly upon Franchisor's request, Franchisee shall deliver executed copies of such agreements to Franchisor.

(d) Nothing herein contained shall be construed so as to require Franchisor to divulge any Trade Secret or other of its secret processes, formulae or ingredients. Franchisor expressly reserves all rights with respect to IHOP's goods, products, Trademarks, Trade Secrets, except for the limited license expressly granted to Franchisee herein.

8.09    Obligations Upon Termination or Expiration.

Upon the expiration or termination of this Agreement for any reason, Franchisee shall deliver and surrender up to Franchisor or its Affiliate any and all manuals, Bulletins, instruction sheets, forms, marks, devices, Trademarks, and the possession of any physical objects bearing or containing any of said Trademarks, and shall not thereafter use any of the same or any such Trademarks or Trade Secrets; provided Franchisor or its Affiliate shall purchase from Franchisee at a price equal to Franchisee's book value, consisting of Franchisee's cost therefor less depreciation computed in accordance with GAAP, all signs, paper goods, dishes, and other items of personal property purchased by Franchisee in the ordinary course of its business which are, in Franchisor's or its Affiliate's reasonable judgment, in good, usable condition and which bear any Trademarks of Franchisor.

IX
FURTHER OBLIGATIONS OF FRANCHISOR

9.01 Initial Training.

If Franchisee, or in the case of a Franchisee which is a Business Entity, an Owner or other designated representative selected by Franchisee and approved by Franchisor ("Designated Representative"), has not previously undergone training conducted by Franchisor for the operation of an IHOP Restaurant, Franchisor, itself or through its Affiliate, shall:

(a)    Furnish 6 weeks of training in the operation of an IHOP Restaurant to Franchisee (or its Designated Representative if Franchisee is a Business Entity), and, upon Franchisee's request, to the manager of the Franchised Restaurant (the "Initial Training"). Said training shall be given at an IHOP Restaurant or a training center designated from time to time by Franchisor. Franchisee (or its Designated Representative if Franchisee is a Business Entity) shall pursue and complete such training to Franchisor's sole subjective satisfaction unless waived by Franchisor in its sole subjective judgment, exercised in good faith, by reason of such person's prior training and experience, in which case the proposed manager of the Franchised Restaurant shall be required to pursue and complete such training (unless waived by Franchisor). If the manager of the Franchised Restaurant is replaced by a new manager, such new manager must attend such Initial Training and complete same to Franchisor's sole subjective satisfaction (unless waived by Franchisor). Franchisor will provide such Initial Training to up to 2 persons during the first year following the Effective Date at no additional cost. If Franchisor provides training to more than 2 persons, or if Franchisee requests

training for its manager more than one year following the Effective Date, Franchisee must pay Franchisor's then current training fee for such training.

(b) If Franchisee has executed this Agreement in connection with a sale or transfer of the Franchised Restaurant to Franchisee from a preexisting franchisee, and Franchisee or its assignor has paid the then-current training fee as contemplated by Section 11.03(a)(iii) below, which is $5,000 as of the date of this Agreement, Franchisor shall, in addition to the Initial Training, and at no additional charge to Franchisee, permit up to 2 of Franchisee's employees or Owners to attend one of Franchisor's regularly scheduled training classes conducted during the one year period following the Effective Date, subject to space availability and Franchisor's reasonable scheduling requirements (including that Franchisor's new franchisees shall have scheduling priority over additional training to Franchisee pursuant to this Section 9.01(b)).

(c) At Franchisor's election, furnish management seminars from time to time for the benefit of its franchisees, on an optional or mandatory basis. Franchisor shall have the right to require Franchisee, its Designated Representative (if applicable), or the manager employed by Franchisee for the Franchised Restaurant, to attend at least one management seminar per year if Franchisor deems attendance to be essential. Said management seminars shall be given at an IHOP Restaurant, a training center, or such other place designated from time to time by Franchisor. Franchisor shall not impose any attendance fee or tuition for mandatory seminars, but may charge a reasonable fee or tuition for optional seminars.

(d) Notwithstanding the fact that Franchisor shall provide the Initial Training and certain other management seminars at no additional charge, Franchisee shall bear all costs and expenses incurred by Franchisee, its Designated Representative, and its managers and other attendees in connection with attendance at all training programs and seminars, including transportation costs, meals, lodging and other living expenses. Neither Franchisor nor any of its Affiliates will pay any compensation for any services performed by any trainee during any training.

9.02 Other Services.

Franchisor or its Affiliates shall furnish Franchisee with:

(a) If this Agreement has been executed pursuant to the Franchisor's Single Store Development Program, Multi-Store Development Program or Purchase Program, on-location assistance for such period of time as Franchisor shall deem necessary, but not exceeding 30 days allocated at Franchisor's sole and absolute discretion between the time immediately prior to and after the opening of the Franchised Restaurant by Franchisee.

(b) If this Agreement has been executed pursuant to the Franchisor's Single Store Development Program, Multi-Store Development Program or Purchase Program, promotional assistance at the time of the opening of the Franchised Restaurant by Franchisee.

(c) Periodic supervision and assistance from field representatives who shall visit the Franchised Restaurant from time to time.

(d) Ongoing availability at its home office for consultation and guidance with respect to the operation and management of the Franchised Restaurant.

(e) In addition to the foregoing, additional assistance from the staff of Franchisor or its Affiliate (i) upon Franchisee's request and subject to staff availability, (ii) or if Franchisee does not have an

IHOPOC305                          21

approved manager, IHOP shall have the right to provide same at a cost to be paid by Franchisee at the then prevailing price per person per day, as shall be specified from time to time in the Operations Bulletins, plus reasonable transportation and living expenses.

(f)   If this Agreement has been executed pursuant to the Franchisor's Single Store Development Program or Multi-Store Development Program, and if Franchisor determines, in its sole discretion, that Franchisee will need training support and/or operational assistance to open the Franchised Restaurant, a training team to provide training support and/or operations assistance for a period of up to 3 weeks, allocated at Franchisor's sole and absolute discretion generally between 1 week prior to opening and up to 2 weeks after opening.  Franchisee agrees to pay to Franchisor a Training Support Fee of up to $16,500.00.  The amount of the fee will be based upon the number of trainers deemed necessary by Franchisor, in its sole discretion.  The opening training support team is typically made up of 7 trainers, of which 4 are provided by Franchisor at no additional cost to Franchisee.  A fifth trainer will be provided by Franchisor, at a cost to Franchisee of $5,500, unless waived by Franchisor.  The additional 2 trainers may be supplied by Franchisee, with the understanding that these trainers must be committed to work on the opening training for the entire duration of the opening training, and provided they meet Franchisor's requirements, as they may be specified from time to time.  These requirements include being a certified trainer in their current IHOP Restaurant, and successfully passing an SOP test administered by Franchisor prior to and at the opening.  There will be no additional charge for these 2 trainers supplied by Franchisee unless Franchisee's trainers fail to meet the above commitments and qualifications, in which case Franchisee will be required to pay $5,500 per additional trainer supplied by Franchisor.  If Franchisee does not have any qualified opening trainers, Franchisee will be required to pay to Franchisor the sum of $16,500 upon execution of this franchise agreement. The scheduling of the training team will generally be done 30 days prior to the anticipated opening date of the Franchised Restaurant, based on the schedule provided by Franchisee.  If training must be rescheduled for any reason other than an act of God, Franchisee shall pay to Franchisor any increase in costs that are incurred by Franchisor due to the scheduling changes, which costs may include but are not limited to increases in airfare, car rental,  and training material shipping and storage. Franchisor estimates this cost to be between $500 and $6,000.  Franchisee shall pay these charges to Franchisor within 30 days after billing therefor.

X
## OTHER OBLIGATIONS OF FRANCHISEE

10.01  Sales and Service of Food Products.

Franchisee shall sell, serve and dispense only those items and products as shall be designated by Franchisor in the Operations Bulletins.  In connection therewith, the parties agree that Franchisor or its Affiliate may, from time to time, recommend or suggest those prices to be charged by Franchisee for each menu item sold or offered at IHOP Restaurants; and, for purposes of economy and cost-saving to those Franchisees who elect to follow such recommendations, may cause the production of pre-priced menus and standardized numbered guest checks which Franchisor or its Affiliate shall offer for sale to Franchisee.  Such recommended or suggested prices are not binding in any respect upon Franchisee, and Franchisee is and shall be at all times, free to charge prices entirely of its own choosing, regardless of whether the same do or do not conform to the recommended or suggested prices.  Franchisee shall not be required to use or to purchase any pre-priced menus or pre-priced standardized numbered guest checks, and shall be entirely free to procure menus and standardized numbered guest checks with prices of its own choosing; provided however that such menus and standardized numbered guest checks shall, in all respects except as to prices, strictly comply with the specifications therefor contained in the Operations Bulletins.

10.02 Required Purchases of Proprietary Products.

(a) Franchisee shall purchase only from Franchisor or its Affiliate (if offered directly to Franchisees by Franchisor) or from Franchisor approved distributors who have purchased such products from Franchisor or its Affiliate, all of its requirements for buckwheat flour, egg batter, buttermilk mix, Harvest Grain 'N Nut® mix, waffle batter, Belgium waffle batter and such other future products as may then be required by Franchisor, all of which embody and shall embody secret formulas owned by Franchisor (collectively referred to as "Required Products").

(b) For purposes of insuring consistency and uniformity of product, Franchisee shall purchase only from Franchisor or its Affiliate (if offered directly to Franchisees by Franchisor or its Affiliate) or from Franchisor-designated suppliers, all of its requirements for coffee. Further, Franchisee shall purchase only such blends of coffee as Franchisor shall from time to time designate.

(c) Except as provided in Sections 10.02 (a) and (b), Franchisee shall purchase for use in the operation of the Franchised Restaurant certain products which bear IHOP Trademarks that may include, as provided in the Operations Bulletins, dishware, silverware, napkins, placemats, coasters and other items (herein referred to as "Trademarked Products"). All such required Trademarked Products shall comply with the specifications set forth in the Operations Bulletins. Franchisee may purchase Trademarked Products from Franchisor or its Affiliate, if made available by Franchisor or its Affiliate, suppliers designated by Franchisor or its Affiliate, or suppliers chosen by Franchisee as provided in paragraph 10.03 below, provided such suppliers execute a royalty-free trademark license in a form reasonably satisfactory to Franchisor.

(d) Without Franchisor's prior written consent, Franchisee may not use, offer, sell, or give away, except at the Franchised Location, any Required Products, Trademarked Products, or other goods or services which utilize Franchisor's Trade Secrets in whole or in part, including its recipes, or any goods, services, materials, equipment, supplies, or inventory (including food, beverages, condiments, and smallwares) purchased by Franchisee or any Affiliate of Franchisee (or any Owner, officer, director, manager of either) from or through any supplier pursuant to any pricing or purchasing terms negotiated or arranged by IHOP or its Affiliates for or on behalf of itself or its franchisees. In addition, Franchisee shall not at any time purchase greater quantities of such products than necessary to meet its reasonably anticipated requirements to operate its IHOP Restaurant.

10.03 Compliance with Franchisor's Specifications.

(a) All food products, services, supplies, equipment, and materials, including standardized numbered guest checks and menus, permitted or required to be used in the operation of the Franchised Restaurant shall be in full compliance with the specifications set forth in the Operations Bulletins and, except only those items referred to in Sections 10.02(a) and (b), shall be purchased and procured by Franchisee from Franchisor or its Affiliate (if offered by Franchisor or its Affiliate), from suppliers designated by Franchisor or its Affiliate, or from suppliers selected by Franchisee and not disapproved in writing by Franchisor or its Affiliate.

(b) In the event that Franchisee should desire to procure any food product other than those described in paragraphs 10.02(a) and (b), service, supply, equipment, or material from any supplier other than Franchisor, its Affiliate, or a supplier designated by Franchisor or its Affiliate, Franchisor or its Affiliate shall, upon request of Franchisee, furnish to Franchisee specifications, by established brand name wherever possible, for all such items. Franchisee shall deliver written notice to Franchisor or its Affiliate of its desire to do so, which notice shall identify the name and address of such supplier and the items desired to be purchased from such supplier. Franchisor may withhold approval of any supplier proposed by Franchisee if, among other grounds, such suppliers shall fail to demonstrate, to the reasonable satisfaction of Franchisor or its Affiliate, (i) the

ability to supply a product meeting the Franchisor's specifications, (ii) reliability with respect to the quality of product or service, or (iii) willingness and agreement to permit Franchisor or its Affiliate to make periodic inspections, reasonable in respect of frequency, time and manner of inspection, to assure continued conformity to specifications.  Should Franchisor or its Affiliate not deliver to Franchisee, within 30 days after its receipt of such notice, a written statement of disapproval with respect to such food product or supplier, it shall be deemed that such food product or supplier is approved by Franchisor or its Affiliate as a supplier of the goods described in the notice until such time as Franchisor or its Affiliate may subsequently withdraw such approval. Franchisor or its Affiliate shall be entitled to disapprove or to subsequently withdraw its approval of any supplier selected by Franchisee only upon the ground that such supplier has failed to meet one or more of the requirements hereinabove set forth.  Once Franchisee has delivered a notice of its desire to purchase the specified items from any such supplier, it shall be entitled to purchase same from such supplier until it shall have received a timely statement of disapproval from Franchisor or its Affiliate; provided, however, that should Franchisee designate a supplier in any such notice who shall previously have been disapproved by Franchisor or its Affiliate, it shall not be permitted to purchase from such supplier unless and until the 30 day period from delivery of such notice shall have expired without delivery from Franchisor or its Affiliate of a statement of disapproval.

(c) In some instances, Franchisor's specifications may be such that only a single supplier or a limited number of suppliers can meet such specifications.  With respect to such products, Franchisee shall purchase such products only from the source or sources designated by Franchisor or its Affiliate.

10.04  Insurance.

(a) Subject to any other additional requirements set forth in the Master Lease, sublease or equipment lease, Franchisee shall procure and maintain at Franchisee's expense during the Term hereof policies of insurance meeting minimum standards, coverages, and limits and insuring Franchisee against the insurable risks prescribed in Franchisor's Operations Bulletins.  All such policies of insurance shall name Franchisor, its Affiliates, if applicable, and such other parties as it may designate as additional insureds, as their interests may appear, and shall provide that Franchisor, its Affiliates, if applicable, and other parties shall receive at least 10 days prior written notification of any cancellation, termination, amendment or modification thereof.

(b) Franchisee shall provide Franchisor, its Affiliates, if applicable, and any other parties designated by Franchisor with Certificates of Insurance evidencing the required coverage at least 10 days prior to the date on which the Franchised Restaurant opens for business to the public, 10 days prior to the date on which any insurance policy is scheduled to expire, and at such other times as Franchisor may reasonably require.

(c) If Franchisee fails or refuses to procure and maintain insurance conforming to the requirements prescribed by the Operations Bulletins, or fails or refuses to provide Franchisor or any other party designated by Franchisor with a certificate of such insurance, Franchisor may but shall not be obligated to procure, through agents and insurance companies of its own choosing, such insurance as is necessary to meet such requirements, provided, however, such insurance need not name Franchisee as an insured or additional insured thereunder.  Payments for such insurance shall be borne by Franchisee.  Nothing herein shall be construed or deemed to impose any duty or obligation on Franchisor to procure such insurance or as an undertaking or representation by Franchisor that such insurance as may be procured by Franchisee or by Franchisor for Franchisee will insure Franchisee against any or all insurable risks of loss which may or can arise out of, or in connection with the Franchised Restaurant.  Franchisee may obtain such other or additional insurance as Franchisee deems proper in connection with the operation of its business.

10.05  Compliance with Applicable Laws and Operations Bulletins.

Franchisee shall operate the Franchised Restaurant in strict compliance with all Applicable Laws and with the standard procedures, policies, rules and regulations established by Franchisor and incorporated herein, or in Franchisor's Operations Bulletins. Such standard procedures, policies, rules and regulations established by Franchisor may be revised from time to time as circumstances warrant, and Franchisee shall strictly comply with all such procedures as they may exist from time to time as though they were specifically set forth in this Agreement and when incorporated in Franchisor's Operations Bulletins the same shall be deemed incorporated herein by reference. By way of illustration and without limitation, such standard procedures, policies, rules and regulations may or will specify accounting records and information, payment procedures, specifications for required supplies and purchases, including Trademarked Products, hours of operation, advertising and promotion, cooperative programs, specifications regarding required insurance, minimum standards and qualifications for employees, design and color of uniforms, menu items, methods of production and food presentation, including the size and serving thereof, standards of sanitation, maintenance and repair requirements, specifications of furniture, fixtures and equipment, flue cleaning, and fire prevention service, appearance and cleanliness of the premises, accounting and inventory methods and controls, forms and reports, and in general will govern all matters that, in Franchisor's judgment, require standardization and uniformity in all IHOP Restaurants. Franchisor or its Affiliate will furnish Franchisee with Franchisor's current Operations Bulletins upon the execution of this Agreement. Said Operations Bulletins and all notices, amendments and supplements relating thereto shall at all times remain the property of Franchisor or its Affiliate. Franchisee shall not reproduce any portion of such Operations Bulletins by any means, shall at all times maintain same in a secure place at the Franchised Location and, upon termination or expiration of this Agreement shall deliver said Operations Bulletins to Franchisor or its Affiliate. Without limiting the generality of the foregoing, Franchisor may establish emergency procedures pursuant to which it may require Franchisee to temporarily close the Franchised Restaurant to the public, in which event Franchisor shall not be liable to Franchisee for any losses or costs, including consequential damages or lost profits occasioned thereby.

10.06  Taxes.

Franchisee shall pay in full any and all city, county, state and federal taxes arising in connection with or levied or assessed by any Governmental Authority in connection with all or any part of this Agreement, or the operation of the Franchised Business, or all or any of the merchandise and assets being sold hereunder, promptly when due, and prior to any delinquency.

10.07  Inspection by Franchisor.

Franchisee expressly authorizes Franchisor, or its representatives, or those of its Affiliate, to enter the Franchised Restaurant at any time it is open for business, without notice, to inspect the premises, fixtures, furnishings and equipment therein, and to examine and inspect the operations in all respects to determine compliance with this Agreement and with Franchisor's standard operating procedures, policies, rules and regulations.

10.08  Participation in Operation of Franchised Business.

Franchisee shall actively participate in the day-to-day operation of the Franchised Restaurant and devote such of its time as is reasonably necessary for the efficient operation of the Franchised Restaurant and the performance of its obligations under this Agreement, all ancillary documents relating hereto and all other agreements which may then be in effect between Franchisor and/or its Affiliate and Franchisee, or Franchisee may employ a manager to operate the Franchised Restaurant, who has previously satisfactorily completed

training conducted by Franchisor for the operation of an IHOP Restaurant, subject to the prior approval of Franchisor, unless waived by Franchisor in its sole subjective judgment, exercised in good faith, by reason of such person's prior training and experience. Franchisee shall not divorce himself or herself from the active conduct of the operation of the Franchised Restaurant. Franchisee shall be entitled to engage in other, noncompetitive business activities (as defined in Section 14.01 below) so long as same do not unreasonably interfere with the conduct of the operation of the Franchised Restaurant.

The Majority Owner of any Business Entity shall be, as applicable, the president of Franchisee if it is a corporation, the manager if it is a limited liability company, the general partner if it is a Partnership, and the comparable position if it is any other form of Business Entity, unless otherwise consented to by Franchisor in its sole, subjective judgment. Franchisor will review any proposed deviations from these approved structures provided Franchisee agrees to reimburse Franchisor for all legal fees and costs it may incur in this review process.

Franchisee is entering into this Agreement for its own account, and not with the intent to transfer the same (except as permitted pursuant to Section 11.03(b) below), or to offer, sell, or negotiate the sale of franchises or licenses to any third party, or otherwise subfranchise, sublicense, subcontract (including execution of any management agreement), share, divide or partition this Agreement and nothing in this Agreement will be construed as granting Franchisee the right to do so. Without limiting the generality of the foregoing, Franchisee shall not: (1) delegate, contract for or otherwise permit a third party to perform or assume responsibility for any part of the operation of the Franchise Restaurant, including in connection with a management contract, purchase or other similar agreement; or (2) require or accept any payment or other consideration from any person for the right to manage or work in the Franchised Restaurant. Further, except with the prior written consent of Franchisor and otherwise in compliance with the provisions of Section 11, no employee or independent contractor may be an Owner of Franchisee if Franchisee is a Business Entity or otherwise have an interest in this Agreement or the Franchised Business.

10.09   Personal Computer.

Upon request by Franchisor, Franchisee shall, at its own cost and expense, obtain and maintain a personal computer as Franchisor or its Affiliate may specify from time to time.

10.10   Business and Ethical Practices.

As of the date of this Agreement, Franchisee and each of its Owners shall be and, during the Term shall remain, in full compliance with all Applicable Laws in each jurisdiction in which Franchisee or such Owners, as applicable, conducts business that prohibits unfair, fraudulent or corrupt business practices in the performance of its obligations under this Agreement and related activities, including but not limited to the following prohibitions:

Neither Franchisee nor any of the Owners shall make any expenditure other than for lawful purposes or directly or indirectly offering, giving, promising to give or authorizing the payment or the gift of any money, or anything of value, to any person or Business Entity, while knowing or having reason to know that all or a portion of such money or thing of value will be given or promised, directly or indirectly, to any government official, official of an international organization, officer or employee of a foreign government or anyone acting in an official capacity for a foreign government, for the purpose of (a) influencing any action, inaction or decision of such official in a manner contrary to his or her position or creating an improper advantage; or (b) inducing such official to influence any government or instrumentality thereof to effect or influence any act or decision of such government or instrumentality.

No government official, official of an international organization, political party or official thereof, or candidate is an Owner or has any investment interest in the revenues or profit of Franchisee.

Neither Franchisee nor any of its Owners conducts any activity, or has failed to conduct any activity, if such action or inaction constitutes a money laundering crime, including any money laundering crime prohibited under the International Money Laundering Abatement and Anti-Terrorist Financing Act ("Patriot Act") and any amendments or successors thereto.

Franchisee nor any of its Owners nor any employee of any of them is named as a "Specially Designated Nationals" or "Blocked Persons" as designated by the U.S. Department of the Treasury's Office of Foreign Assets Control.   Currently, this list is published under the internet website address "www.ustreas.gov/terrorism.html".  Franchisee is neither directly nor indirectly owned or controlled by the government of any country that is subject to a United States embargo.  Nor does Franchisee or any of its Owners act directly or indirectly on behalf of the government of any country that is subject to a United States embargo.  Franchisee agrees that it will notify Company in writing immediately of the occurrence of any event, which renders the foregoing representations and warranties of this paragraph incorrect.

Franchisee and its Owners represent that they understand and have been advised by legal counsel on the requirements of the applicable laws referred to above, including the United States Foreign Corrupt Practices Act (currently located at www.usdoj.gov/criminal/fraud/fcpa.html), any local foreign corrupt practices laws and the Patriot Act (currently located at www.epic.org/privacy/terrorism/hr3162.html), and hereby acknowledge the importance to Company, the System and the parties' relationship of their respective compliance with the requirements of this Section 10.09, including any applicable auditing requirements and any requirement to report or provide access to information to Company or any government, that is made part of any applicable law.  Franchisee shall take all reasonable steps to require its consultants, agents and employees to comply with such laws prior to engaging or employing any such persons.

INITIALS:     1385 - Tyler, Inc. (By: Meredith Elston, President)

Franchisee represents to Company that it has taken all necessary and proper action required by the laws of the Development Area and has the right to execute this Agreement and perform under all of its terms.

XI
ASSIGNMENT

11.01  <u>Assignment by Franchisor</u>.

Franchisor shall have the right to assign this Agreement and all of its rights and privileges hereunder to any other person or Business Entity; provided that, in respect to any assignment resulting in the subsequent performance by the assignee of the functions of Franchisor, the assignee shall expressly assume and agree to perform such obligations.

11.02  <u>Assignment by Franchisee</u>.

(a)  During the Term, Franchisee shall have the right to assign, transfer or sell its interest in this Agreement, upon the terms and conditions provided herein, and subject to the provisions contained in Sections 11.03, and 11.04.  The terms "Assign" and "Assignment" shall include, if Franchisee is a Business Entity, each of the following: (i) the sale, assignment, transfer, conveyance, gift, pledge, mortgage, or other encumbrance of more than 49% in the aggregate, whether in one or more transactions, of the Stock of Franchisee, by operation of law or otherwise or any other event(s) or transaction(s) which, directly or indirectly, effectively

changes management control of Franchisee; (ii) the issuance of any securities by Franchisee which itself or in combination with any other transaction(s) results in the Owners existing as of the Effective Date owning less than 51% of the outstanding shares, membership interests or voting power of Franchisee as constituted as of the Effective Date; (iii) if Franchisee is a Partnership, the withdrawal, death or legal incapacity of a general partner or limited partner owning 51% or more of the Partnership Rights of the Partnership, or the admission of any additional general partner or the transfer or assignment by any general partner of any of its Partnership Rights in the Partnership; (iv) the death or legal incapacity of any direct or indirect Majority Owner; (v) the sale, assignment, transfer, conveyance, gift, issuance of securities or any other event or transaction, whether in one or more transactions, by any direct or indirect Majority Owner as of the Effective Date which results in such Majority Owner owning, directly or indirectly, less than 51% of the Stock in Franchisee; and (vi) any merger, stock redemption, consolidation, reorganization, recapitalization or other transfer of control of the Franchisee, however effected.  Notwithstanding the foregoing, Franchisee shall not have the right to pledge, encumber, hypothecate or otherwise give any third party a security interest in this Franchise Agreement or any of the rights of Franchisee hereunder, or in the operation of the Franchised Restaurant by any other person, in any manner whatsoever, without the express written permission of Franchisor, which permission may be withheld for any reason whatsoever in Franchisor's sole subjective judgment.  In all events, Franchisor shall have the right, but not the obligation, to furnish any prospective assignee with copies of all financial statements which have been furnished by Franchisee to Franchisor in accordance with this Agreement during the 3 year period prior to the date for which approval of the proposed Assignment is sought.  Franchisor's approval of such proposed transaction shall not, however, be deemed a representation or guarantee by Franchisor that the terms and conditions of the proposed transaction are economically sound or that, if the transaction is consummated, the proposed assignee will be capable of successfully conducting the Franchised Business and no inference to such effect shall be made from such approval.  Notwithstanding anything to the contrary herein, in the event of the death or legal incapacity of Franchisee or, if Franchisee is a Business Entity, the Owner holding 50% or more of the Stock or voting power of Franchisee, the transfer of Franchisee's or such Owner's interest in this agreement to its heirs, personal representatives or conservators, as applicable, shall not give rise to Franchisor's right of first refusal hereunder, although such right shall apply as to any proposed Assignment by such heirs, personal representatives or conservators.

(b)     In the event Franchisee has executed this Franchise Agreement pursuant to a Multi-Store Development Agreement, then notwithstanding anything to the contrary herein, during the term of the Multi-Store Development Agreement, this Franchise Agreement may not be transferred or assigned without a simultaneous assignment to the same assignee of all then existing Franchise Agreements executed pursuant to the Multi-Store Development Agreement (and all of the assets of the Restaurants developed and under development pursuant thereto) and of the Multi-Store Development Agreement (or any successor area development agreement(s) executed for the Development Area, in whole or in part).

11.03  Conditions to Assignment by Franchisee.

(a) Any Assignment by Franchisee shall be subject to the following conditions:

(i) Except in the case of Franchisee's death or legal incapacity, Franchisee shall serve upon Franchisor written notice of the proposed Assignment, setting forth all of its terms and conditions and all available information concerning the proposed assignee.

(ii) Franchisee shall obtain Franchisor's written consent, not to be unreasonably withheld, of the proposed Assignment.  The withholding of such consent by Franchisor shall be reasonable if, by way of illustration and not by limitation, the proposed assignee (1) is not financially responsible and economically or otherwise capable of performing the obligations of Franchisee hereunder; (2) does not meet the then-current

standards set by Franchisor with respect to its new franchisees; (3) fails to complete Franchisor's Initial Training program in accordance with Franchisor's then current standards, (4) fails to designate a single individual acceptable to Franchisor, with whom Franchisor may primarily communicate, (5) fails, upon Franchisor's request, to sign Franchisor's form of franchise agreement then being offered to prospective franchisees (except that: (x) the assignee shall not be obligated to pay any Initial Franchise Fee other than its assumption of any existing promissory note executed by its assignor which shall not have been paid in full; (y) the Term and any remaining Renewal Rights thereunder shall be the same as set forth in this Agreement; and (z) the assignee's Continuing Royalty, National Advertising Fee and Local Advertising Fee shall not exceed the rates set forth in Sections 6.01, 7.01 and 7.02 hereof); or (6) if any of the assignee's Owners and/or spouses, as applicable, fail or refuse to execute a guaranty in form satisfactory to Franchisor.

(iii) Franchisee, or Franchisee's heirs, personal representatives or conservators in the case of Franchisee's death or incapacity, shall pay Franchisor the transfer fee specified from time to time in the Operations Bulletins (the "Transfer Fee"). As of the date of this agreement, the transfer fee consists of a $5,000 transfer fee and a $5,000 training fee. Franchisor may waive all or part of the training fee to the extent that Franchisor determines in its sole subjective judgment that the assignee does not require training.

(iv) As of the date of any such Assignment, Franchisee shall be in compliance with all of its obligations owing to Franchisor or any of its Affiliates whether pursuant to this Agreement, or any other agreements with Franchisor or its Affiliate, and shall pay in full all outstanding amounts owed to Franchisor and its Affiliates, and the remaining balance, if any, of the Initial Franchise Fee, unless waived by Franchisor.

(v) As a condition precedent to Franchisor's written consent, Franchisor itself, or through its Affiliate, shall have the right, at its sole discretion, to conduct an audit and/or sales verification prior to the proposed Assignment.

(vi) Unless Franchisor otherwise consents, if the proposed assignee is a Business Entity, one person approved by Franchisor shall at all times own directly or indirectly, 51% or more of the Stock of the proposed assignee.

(vii) Franchisee shall execute and deliver to Franchisor a general release, on a form prescribed by Franchisor of any and all known claims against Franchisor and its Affiliates and their officers, directors, agents, shareholders and employees, with respect to this Franchised Restaurant.

(b) If Franchisee is an individual and not a Business Entity, he or she shall have the right, without paying a Transfer Fee and without complying with the provisions of Section 11.04, to Assign this Agreement to a Business Entity formed by Franchisee for the purpose of owning and operating the Franchised Restaurant, after first complying with the following conditions:

(i) Franchisee shall, together with said Business Entity, be jointly and severally liable for all existing or subsequent breaches of this Agreement and any other agreement between Franchisee and Franchisor or its Affiliate, and for all obligations accrued or accruing thereunder. Franchisee, his/her spouse, as applicable, and all other Owners and their spouses, as applicable, shall sign a guaranty in the form prescribed by Franchisor. Franchisee shall waive notice or demand in the event of default, and will be bound by any modifications or supplemental agreements entered into between the assignee Business Entity and Franchisor and/or its Affiliate, as hereinafter set forth;

(ii) The assignee Business Entity shall provide Franchisor with all charter or other documents, and execute an acceptance of such assignment, in the form prescribed by Franchisor which shall contain covenants agreeing to be bound by all of the terms and conditions herein contained;

(iii) Franchisee shall be possessed of and retain at all times, legal and beneficial ownership of not less than 51% of all the outstanding Stock of the assignee (including the voting power of such Stock), unless otherwise agreed to in writing by Franchisor in its sole discretion;

(iv) All of the Stock certificates or other evidence of Ownership issued by assignee Business Entity shall have endorsed upon them the following legend: "The transfer of this [Stock] is subject to the terms and conditions of a Franchise Agreement, relating to an IHOP Restaurant, dated _____, 20____", and the date of this Agreement shall be inserted into such statement; and

(v) When incorporation or organization of the Business Entity shall have been completed, Franchisee shall advise Franchisor and thereafter keep Franchisor advised of the names, addresses and titles of the officers, directors, and resident agent of the assignee corporation, the names and addresses of the shareholders and the number of shares issued to each, and the address of the principal office of said corporation.

(vi) No Assignment pursuant to this paragraph 11.03(b) shall be deemed to be effective unless and until Franchisee shall have complied with all of the provisions hereunder.

11.04  Franchisor's Right of First Refusal.

(a) Except with respect to an Assignment to a Business Entity as provided for in paragraph 11.03(b), or an Assignment to Franchisee's heirs, personal representatives or conservators in the case of Franchisee's death or legal incapacity, within 30 days after Franchisor's receipt of Franchisee's notice of its intent to assign its interest in this Agreement (or if Franchisor shall request additional information, within 30 days after receipt of such additional information), Franchisor may, at its option, accept the proposed Assignment to itself or its nominee, upon the terms and conditions specified in the notice.

(b) Should Franchisor not exercise its option and Franchisee fails to consummate the proposed Assignment within 90 days upon the same terms and with the same assignee as disclosed in the notice to Franchisor, Franchisor's right of first refusal shall revive.

11.05  Offers of Securities.

Securities, partnership or other ownership interests in Franchisee may not be offered to the public under the Securities Act of 1933, as amended, nor may they be registered under the Securities Exchange Act of 1934, as amended, or any comparable federal, state or foreign law, rule or regulation. Such interest may be offered by private offering or otherwise only with the prior written consent of Franchisor, which consent shall not be unreasonably withheld. All materials required for any such private offering by federal or state law shall be submitted to Franchisor for a limited review as discussed below prior to being filed with any governmental agency; and any materials to be used in any exempt offering shall be submitted to Franchisor for such review prior to their use. No such offering by Franchisee shall imply that Franchisor is participating in an underwriting, issuance or offering of securities of Franchisee or Franchisor, and Franchisor's review of any offering materials shall be limited solely to the subject of the relationship between Franchisee and Franchisor and its Affiliates. Franchisor may, at its option, require Franchisee's offering materials to contain a written statement prescribed by Franchisor concerning the limitations described in the preceding sentence. Franchisee, its Owners and the other participants in the offering must fully defend and indemnify Franchisor, and its Affiliates, their respective officers, directors, manager(s) (if a limited liability company), shareholders, members, partners, agents, representatives, independent contractors, servants and employees of each of them, from and against any and all losses, costs and liability in connection with the offering and shall execute any

additional documentation required by Franchisor to further evidence this indemnity.  For each proposed offering, Franchisee shall pay, in addition to any transfer fee required under Section 11.05 of this Agreement, to Franchisor such amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering including without limitation, legal and accounting fees. Franchisee shall give Franchisor written notice at least 30 days prior to the date of commencement of any offering or other transaction covered by this Section.

11.06  Delegation by Franchisor.

Franchisor shall have the right to delegate to one or more of its Affiliates some or all of Franchisor's duties to Franchisee under this Agreement; provided, however, Franchisor shall remain fully responsible to Franchisee for the full and faithful performance of all its obligations to Franchisee hereunder.

XII<br>DEFAULT BY FRANCHISEE

12.01  Right of Termination After Notice of Default.

Except as otherwise expressly provided for in this Agreement, Franchisor may terminate this Agreement prior to its expiration after providing written notice of Franchisee's Material Breach of this Agreement to Franchisee, if such Material Breach shall not be cured within 7 days.  If any such Material Breach, except those relating to the nonpayment of money, by its nature cannot be cured within such 7 day period, and Franchisee shall immediately commence and diligently continue to cure such default, Franchisor shall allow Franchisee such additional reasonable period of time as Franchisor deems reasonably necessary to cure such Material Breach.  As used herein, the phrase "Material Breach" shall include:

(a) The express repudiation by Franchisee of any of its payment obligations under the agreements listed in paragraph 16.03 hereinbelow (hereinafter, "the agreements") or its stated or announced refusal thereafter to meet any such payment obligations, which repudiation or refusal shall not be expressly withdrawn in writing by Franchisee within 7 days after written notice from Franchisor so to do.

(b) The failure or refusal by Franchisee to pay its payment obligations to Franchisor arising under the agreements during each of 2 or more weekly transmittal periods, either consecutive or nonconsecutive.  Such failure to pay will be deemed to have occurred whenever an insufficient payment shall accompany any transmittal or whenever any transmittal shall not have been submitted by Franchisee within 5 days after same is due.

(c) Any other failure to meet Franchisee's monetary obligations to Franchisor or its Affiliate, wherein any part of such unpaid obligations shall be more than 35 days past due.

(d) Failure to keep the Franchised Restaurant open for business during ordinary business hours for a continuous period of more than 3 days, without the prior written consent of Franchisor, (hereinafter "Voluntary Abandonment"), unless and for so long as the Franchised Restaurant was closed by reason of: (1) action by any Governmental Authority, not related to a breach by Franchisee of this Agreement, (2) the death or disability of Franchisee, or (3) *force majeure* not caused, directly or indirectly, by Franchisee's willful conduct.

(e) Any default by Franchisee under any mortgage, deed of trust, lease or sublease, including any sublease with Franchisor or its Leasing Affiliate, covering the premises in which the Franchised Restaurant is located, which results in Franchisee being unable to continue operations at the Franchised Restaurant.

(f) Franchisee's insolvency (as revealed by its records or otherwise); or, if Franchisee files a voluntary petition and is adjudicated a bankrupt; or if an involuntary petition is filed against it and such petition is not dismissed within 30 days; or if it shall make an assignment for the benefit of creditors; or if a receiver or trustee in bankruptcy or similar officer, temporary or permanent, be appointed to take charge of Franchisee's affairs or any of its property; or if dissolution be commenced by or against Franchisee or if any judgment against Franchisee remains unsatisfied or unbonded of record for 15 days;

(g) Franchisee's failure to comply with any other material obligation of Franchisee under the agreements, including a failure to comply with Franchisor's Operations Bulletins as described in paragraph 10.05.

12.02     Termination Without Notice

Franchisor shall have the right to terminate this Agreement immediately, without prior notice to Franchisee, upon the occurrence of any or all of the following events, each of which shall be deemed an incurable breach of this Agreement:

(a) Franchisee's knowingly withholding the rendering or reporting of any of Franchisee's Gross Sales.

(b) Franchisee's material misrepresentation to Franchisor with respect to any information provided in connection with its application to become an IHOP Franchisee, including any relevant credit information.

(c) If Franchisee shall attempt to Assign this Agreement, without the prior written consent of Franchisor, or if an Assignment of this Agreement by Franchisee shall occur by operation of law, or by reason of judicial process.

(d) If Franchisee shall attempt to Assign Franchisor's Trademarks, or the goodwill connected thereto, or if Franchisee shall use, or permit the use of said Trademarks, or the goodwill connected thereto in derogation of Franchisor's rights pursuant to this Agreement, or if Franchisee shall use or permit the use of said Trademarks, or the goodwill annexed thereto in a manner, or at locations not authorized by Franchisor pursuant to the terms of this Agreement.

(e) Conviction of Franchisee, or any of its principal shareholders, of a felony or any other criminal misconduct which is relevant to the operation of the franchise.

(f) If in Franchisor's reasonable judgment, Franchisee's continued operation of the franchise will result in an imminent danger to public health or safety.

(h) If Franchisee fails, for a period of 10 days after notification of noncompliance, to comply with any Applicable Law governing the operation of the Franchised Restaurant.

(i) If Franchisee is a party to a sublease with Franchisor or its Leasing Affiliate, the attachment of any involuntary lien in the sum of $10,000 or more upon any of the business assets or property of Franchisee which lien is not removed, or for which Franchisee does not post bond sufficient to satisfy such lien within 30 days after notification of such lien.

(j) If this Agreement has been signed under the Single Store Development Program, and Franchisee fails to open the Restaurant by the date specified in Section 4.02 (a) or 4.02 (b) (unless Franchisee has complied with Section 4.02 (d)).

12.03  Form of Notice.

Franchisor shall provide notice of default to Franchisee in accordance with the following:

(a) With respect to the non-payment of financial obligations by Franchisee, said notice shall contain an accounting, taken from the books and records of Franchisor or its Affiliate, of the amounts of each of the unpaid obligations, the items for which such obligations are unpaid, and the dates upon which such obligations became due, as well as an allocation of credits made for partial payments, if any.

(b) With respect to notice of default and of intent to terminate if said default is not cured, in respect of a breach of contract other than the non-payment of money, such notice shall contain the following:

(i) The specific provision or provisions of the specific agreement or standard operating procedures violated;

(ii) The nature of the violation or violations;

(iii) The date such violations were observed, and by whom they were observed and reported; and the date or dates, if any, that Franchisor had given any previous written notice of such violation or violations to Franchisee.

(c) The curing of any breach within the time period specified in the notice of default shall nullify Franchisor's right of termination for the causes stated in said notice (but not for a recurrence of any such cause thereafter); provided, however, that if there shall be a course of conduct in bad faith followed by Franchisee over an extended period in providing good cause for termination and, subsequently, timely curing of deficiencies upon receipt of notice of default, such continued and repeated course of conduct shall itself be good cause for immediate termination of the Agreement without further notice of intention to terminate.

12.04  Conformity With Laws.

If any law or regulation by any competent authority with jurisdiction over this Agreement shall limit Franchisor's rights of termination or require a longer or different notice than that specified in this Article XII, same shall be deemed amended to conform with the minimum requirements of such law or regulation.

XIII
ARBITRATION AND REMEDIES

13.01  Arbitration.

(a) Subject to Section 13.01(b), any controversy or claim, except those described in paragraph 13.03, arising out of or relating to this Agreement, or any agreement relating thereto, or any breach of this Agreement including any claim that this Agreement or any portion thereof is invalid, illegal or otherwise voidable, shall be submitted to arbitration before and in accordance with the commercial rules of the American Arbitration Association provided that the jurisdiction of the arbitrators shall be limited to a decision rendered pursuant to California common and statutory law and judgment upon the award may be entered in any court having jurisdiction thereof; provided, however, that this clause shall not limit Franchisor's or its Affiliate's right to obtain any provisional remedy, including injunctive relief, or to obtain writs of recovery of possession, or

similar relief, from any court of competent jurisdiction, as Franchisor or its Affiliate deems to be necessary or appropriate in Franchisor's or such Affiliate's sole subjective judgment, to compel Franchisee to comply, or to prohibit Franchisee's non-compliance, with its obligations hereunder or under the sublease, if applicable, or to obtain possession of the Franchised Location, or to protect the Trademarks or other property rights of Franchisor. Franchisor or such Affiliate may, as part of such action or proceeding, seek damages, costs and expenses caused to or incurred by it by reason of the act or action or non-action of Franchisee which caused Franchisor or such Affiliate to institute such action or proceeding. The institution of any such action or proceeding by Franchisor or its Affiliate shall not be deemed a waiver on its part to institution of an arbitration proceeding pursuant to the provisions of this Article. If Franchisee subleases the Franchised Restaurant or Franchised Location by or through Franchisor or its Affiliate, in the event of an arbitration award which includes a determination that this Agreement is or has expired or has been terminated by reason of Franchisee's default thereof, Franchisee consents to the entry of a judgment by a court of competent jurisdiction containing an appropriate writ for the recovery of possession of the premises. The situs of arbitration proceedings shall be in Los Angeles, California.

(b) All arbitration proceedings and claims shall be filed and prosecuted separately and individually in the name of Franchisee and Franchisor (and/or its Affiliate), and not in any representative capacity, and shall not be consolidated with claims asserted by or against any other franchisee. The following shall not be subject to arbitration: any claim or dispute involving or contesting the validity of any of the Trademarks, any dispute alleging a violation of federal or state securities law, and class action claims. The decision of whether any issue, claim, controversy or dispute is arbitrable shall be made by the arbitrator, who shall have jurisdiction to make such determination. Unless prohibited by law, both Franchisor and Franchisee hereby waive the right, if any, to obtain any award for exemplary or punitive damages from the other in any arbitration, or judicial proceeding, or other adjudication, arising out of or with respect to this Agreement, or any breach thereof, including any claim that said Agreement, or any part thereof, is invalid, illegal or otherwise voidable or void. The arbitration and the parties' agreement therefor shall be deemed to be self-executing, and if either party fails to appear at any properly-noticed arbitration proceeding, an award may be entered against such party despite said failure to appear.

13.02 Remedies of Franchisor.

(a) In the event of a Material Breach of this Agreement, Franchisor may, at its election pursue the following remedies in addition to such other remedies as may be available to it hereunder and at law or equity: (i) terminate this Agreement, and thereafter bring such action as it may deem proper to protect its rights hereunder, in accordance with the provisions of this Article XIII, and (ii) seek to recover such damages, including all sums due and owing pursuant to this Agreement and any other agreement relating thereto, and the benefit of its bargain hereunder, as Franchisor may, in its discretion, deem appropriate. In computing such damages, it is agreed that the benefit of Franchisor's bargain shall include Franchisor's average Continuing Royalty fee of 4.5% of Franchisee's Gross Sales, computed on the basis of the last 26 weeks that Franchisee conducted business at its Franchised Restaurant (or if any such Franchised Restaurant is open for less than 26 weeks, the entire period that any such Franchised Restaurant is open for business) multiplied by the number of weeks remaining under this Franchise Agreement, computed from the effective date of the termination of this Agreement. Said sum shall thereupon be "present valued" by discounting the same, on an annual basis, predicated upon the prime rate charged by the Chase Manhattan Bank of New York City, on the effective date of such termination.

(b) Franchisor will not, nor will it threaten to or state or represent that it has the right or intention to, exercise self help in regaining possession of the Franchised Restaurant or premises or physically evict or attempt to evict Franchisee from the Franchised Restaurant other than by due process of law. In the event of termination, Franchisor will obtain possession of the premises only through the voluntary surrender thereof

by Franchisee, or pursuant to the legal enforcement of a judgment of a court of competent jurisdiction or of an award of an arbitration tribunal in accordance with Section 13.01.

13.03  Summary Possessory Actions.

(a) If Franchisee subleases the Franchised Restaurant or Franchised Location from Franchisor or its Affiliate, Franchisor or such Affiliate shall be entitled to maintain actions in unlawful or forcible detainer or other appropriate summary possessory action for recovery of the premises of said Franchised Restaurant or Location, in a court of competent jurisdiction without being required to resort to arbitration (except as provided in Section 13.03(c)(ii) hereof), in respect of any uncured default by Franchisee in payment of premises rental under the sublease or by reason of any of the causes specified in Sections 12.01 (a) through (g), for a judgment which shall, if Franchisor or such Affiliate shall prevail therein, include both an order for restitution of the premises and any monetary relief incident thereto which may by law be awarded in any such possessory action. In any such possessory action by Franchisor or such Affiliate, Franchisee shall be entitled to assert defenses, set offs and counterclaims, if any, which are permitted by applicable law in such a possessory action, but no others; and, if Franchisee shall prevail thereon, it may obtain any relief thereon which may by law be awarded in such possessory action.

(b) With respect to any such possessory actions provided and referred to in Section 13.03(a), wherein such possessory action is based on monetary default, neither Franchisor nor its Affiliate shall base any claim of monetary default upon its having applied any Franchisee payments to it to the accelerated and unaccrued portion of Franchisee's Initial Franchise Fee note or notes, if applicable, at any time that such application would have left any other current or past due obligations unpaid.

(c) Should Franchisee deny or dispute the amount of the indebtedness described or referred to in the notice of default, it shall within the time specified for the cure of such default deliver to Franchisor or its Affiliate a written statement of the amount claimed by it to be the correct amount of the indebtedness and of the factual basis for such claim; and it shall either accompany such statement with its remittance of full payment of the amount acknowledged by it to be owing or shall make such arrangements with Franchisor for the payment of such amount as shall be satisfactory and acceptable to Franchisor or its Affiliate. Should Franchisee have timely done so, it will then be permitted to litigate any such dispute as to the amount, if any, of the remaining indebtedness as follows:

(i) In those states wherein litigation of such dispute is permitted in possessory actions by law, stipulation or agreement of the parties, such dispute shall be so litigated. It shall not be a ground for denial of a judgment for possession to Franchisor or its Affiliate that the amount of the indebtedness so determined may be less than or different from the amount claimed by Franchisor or its Affiliate. Execution upon such judgment, however, shall be stayed for 7 days, during which time Franchisee may retain possession of the Franchised Restaurant and obtain vacation of the judgment by (1) paying to Franchisor or its Affiliate the full amount of the adjudicated and unpaid indebtedness, plus the full amount of any and all subsequently accruing and unpaid obligations to Franchisor or its Affiliate up to and including the date of entry of such judgment, or by (2) making such arrangements with Franchisor or its Affiliate for the payment of such amount as shall be satisfactory and acceptable to Franchisor or its Affiliate, as applicable.

(ii) In those states where litigation of the amount of such indebtedness is not permitted in such possessory actions, the possessory action may nonetheless be commenced and maintained by Franchisor or the applicable Affiliate. Disputes as to the amount of indebtedness may be concurrently submitted to arbitration. Following arbitration, Franchisee shall have the same rights of payment and cure of default, upon the same conditions, as are hereinabove provided in section (i) of this subparagraph (c).

(iii) Nothing contained in this subparagraph (c) shall be deemed, construed or interpreted as allowing Franchisee in such possessory action to litigate any claims or defenses other than the issue of the correct computation of its indebtedness (exclusive of set offs or counterclaims) unless the litigation of such other claims or defenses is permitted in possessory actions by the applicable law of the subject state.

13.04   Interest on Late Payments.

In addition to the other remedies available to Franchisor, in the event that Franchisee shall fail or refuse to make any of the payments due under this Agreement, any sublease, any equipment lease, or any purchase contracts for equipment or supplies which were entered into prior to, contemporaneously with or subsequent to this Agreement, when due, Franchisee shall pay interest at the highest rate permitted by law, or 1.5% per month, whichever is less, of such late obligations to defray the cost of maintaining Franchisee's account in arrears, it being expressly understood that payment of this charge shall not forgive or excuse any arrearage.

## XIV
## NON-COMPETITION

14.01   General.

Without Franchisor's prior written consent which may be withheld for any reason in Franchisor's sole subjective discretion, Franchisee shall not, during the Term, including any extension or renewal thereof, directly or indirectly, own, operate, control or have any financial interest in any family style restaurant, pancake house, coffee shop, buffet serving breakfast, or diner, including but not limited to the Village Inn, Bob's Big Boy, Shoney's, Denny's, Perkins', Waffle House, Baker's Square, Coco's, JB's, Allie's, Cracker Barrel, Marie Callendar's, Friendly's, Bob Evans' Farms, Mimi's Carrows, Denny's Diner, Golden Corral, Original Pancake House, Country Kitchen, Hometown Buffet, or any other food service operation that sells pancakes or derives more than 25% of its total sales from sit down breakfast items. The foregoing prohibitions shall not apply to ownership by Franchisee of less than 3% of the issued and outstanding stock of any company whose shares are listed for trading over any public exchange or over-the-counter market and whose business includes the owning, operating, or franchising of family style restaurants, pancake houses, or coffee shops, provided Franchisee does not control any such company. Franchisee also agrees that it will not at any time communicate, divulge, or use for the benefit of himself or herself or any other person or entity, other than in the course of conduct of the Franchised Restaurant, any information or knowledge which it may have acquired in connection with the operation of the Franchised Restaurant, and that it will not do any act prejudicial or injurious to the business or goodwill of Franchisor, any of its Affiliates, or any other IHOP franchisee. As used in this paragraph "Franchisee" shall include Franchisee and each of its Owners and affiliates, the respective officers, directors, managers and affiliates of each of them, and the spouse and family members who live in the same household of each of the foregoing who are individuals.

## XV
## INDEMNITY BY FRANCHISEE

15.01   Indemnity by Franchisee.

Franchisee shall defend, indemnify and hold Franchisor and each Affiliate harmless from and against any and all claims, demands, losses, damages, costs, liabilities and expenses (including attorneys' fees and costs of suit) of whatever kind or character, on account of any actual or alleged loss, injury or damage to any person, firm or corporation or to any property arising out of or in connection with the operation of the Franchised Restaurant.

Case 6:20-cv-00099-JDK   Document 1-2   Filed 02/25/20   Page 38 of 43 PageID #:  55

## XVI
## MISCELLANEOUS

### 16.01  Right To Cure Defaults

In addition to all other remedies herein granted, if Franchisee shall default in the performance of any of its obligations or breach any term or condition of this Agreement or any related agreement, Franchisor or its Affiliate may, at its election, immediately or at any time thereafter, without waiving any claim for breach hereunder and without notice to Franchisee cure such default for the account and on behalf of Franchisee, and the cost to Franchisor or its Affiliate thereof shall be due and payable on demand and shall be deemed to be additional compensation due to Franchisor or its Affiliate hereunder and shall be added to the amount of compensation next accruing hereunder, at the election of Franchisor or its Affiliate.

### 16.02   Obligations Upon Termination

(a)  In the event of the termination or expiration of this Agreement for whatever reason, Franchisee shall forthwith discontinue the use of Franchisor's Trademarks and shall not thereafter operate or do business under any name or in any manner that might tend to give the general public the impression that it is either directly or indirectly associated, affiliated, franchised or licensed by or related to, the IHOP Restaurant system, and shall not, either directly or indirectly, use any name, logotype, symbol or format confusingly similar to the IHOP Trademarks or formats, at either the Franchised Location, the Franchised Restaurant or any other location not then franchised to Franchisee by Franchisor.   Since Franchisor's IHOP Restaurants have a distinctive color scheme, unless Franchisor exercises its right to cause an assignment of the lease for the Franchised Location or Franchised Restaurant pursuant to paragraph 4.04(a), Franchisee shall promptly upon demand by Franchisor or its Affiliate repaint the Franchised Restaurant in a different color scheme.  In addition, upon such expiration or termination, Franchisee shall not, either directly or indirectly, for any purpose whatsoever, use any of Franchisor's Trade Secrets, procedures, techniques or materials acquired by Franchisee by virtue of the relationship created by this Franchise Agreement, including, (i) recipes, formulae and descriptions of food products; (ii) the Operations Bulletins and all manuals, Bulletins, instruction sheets, and supplements thereto and shall return same to Franchisor; (iii) all forms, advertising matter, marks, devices, insignias, slogans and designs used from time to time in connection with IHOP Restaurants; and (iv) all copyrights, Trademarks and patents now or hereafter applied for or granted in connection with the operation of IHOP Restaurants.

(b)  Further, Franchisee shall, at Franchisor's option, cancel or assign to Franchisor or its designate all of Franchisee's right, title and interest in any internet and website home pages, domain name listings and registrations which contain the Trademarks, or any of them, in whole or part, and Franchisee shall notify Network Solutions, InterNIC or other applicable domain name registrar and all listing agencies, upon the termination or expiration hereof, of the termination of Franchisee's right to use any domain name, web page and other internet devise associated with Franchisor or any "IHOP" Restaurant, and authorize and instruct their cancellation or transfer to Franchisor, as directed by Franchisor.  Franchisee is not entitled to any compensation from Franchisor if Franchisor exercises its said rights or options.

(c)  Franchisor shall have the option, exercisable by written notice within 30 days after the termination of this Agreement, to take an assignment of all telephone numbers (and associated listings) for the Franchised Restaurant, and Franchisee shall notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use any telephone number and any classified or other telephone directory listings associated with the Restaurant, and authorize and instruct their transfer to Franchisor.  Franchisee hereby irrevocably appoints Franchisor as Franchisee's attorney-in-fact to execute in the name of and on behalf of Franchisee any and all instruments necessary or appropriate to transfer any or all such telephone numbers and listings to Franchisor, if Franchisee fails to do so for any reason.

(d) The covenants of Franchisee contained in this paragraph 16.02 shall survive the termination of this Agreement.

16.03 Entire Agreement.

This Agreement contains all of the terms and conditions agreed upon by the parties hereto with reference to the specific subject matter hereof, and no other agreements oral or otherwise shall be deemed to exist or to bind any of the parties hereto and all prior and contemporaneous agreements, understandings and representations are merged herein and superseded hereby. No officer or employee or agent of Franchisor has any authority to make any representation or promise not contained in this Agreement or in any Offering Circular for prospective franchisees required by Applicable Law, and Franchisee agrees that he has executed this Agreement without reliance upon any such representation or promise. Notwithstanding the foregoing, for purposes of default, with respect to any other agreements relating hereto, including any purchase agreement, assignment of purchase agreement, lease or sublease for the Franchised Location or Franchised Restaurant, any equipment purchase agreement, equipment lease or sublease, any sign lease, or any purchase contracts for equipment or supplies which were entered into prior to, contemporaneously with, or subsequent to the Effective Date between Franchisee and Franchisor or its Affiliate, or between Franchisee and third parties, or any franchise fee promissory Note, any material default thereof shall also be a material breach of this Agreement. This Agreement cannot be modified or changed except by written instrument expressly referring to this Agreement, signed by all of the parties hereto.

16.04 Severability.

Nothing contained in this Agreement shall be construed as requiring the commission of any act contrary to law. Whenever there is any conflict between any provisions of this Agreement or the Operations Bulletins and any present or future statute, law, ordinance, regulation, or judicial decision, contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event the provision of this Agreement or the Operations Bulletins thus affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law. In the event that any part, Article, paragraph, sentence or clause of this Agreement or the Operations Bulletins shall be held to be indefinite, invalid or otherwise unenforceable, the indefinite, invalid or unenforceable provision shall be deemed deleted, and the remaining part of the Agreement shall continue in full force and effect, unless said provision pertains to the payment of fees, pursuant to Articles V, VI and VII hereof, in which case this Agreement shall, at Franchisor's option, terminate.

16.05 Waiver And Delay.

No waiver by Franchisor of any breach or series of breaches or defaults in performance by Franchisee and no failure, refusal or neglect of Franchisor either to exercise any right, power or option given to it hereunder or to insist upon strict compliance with or performance of Franchisee's obligations under this Agreement or the Operations Bulletins, shall constitute a waiver of the provisions of this Agreement or the Operations Bulletins with respect to any prior, concurrent or subsequent breach thereof or a waiver by Franchisor of its rights at any time thereafter to require exact and strict compliance with the provisions thereof.

16.06 Survival Of Covenants.

The covenants contained in this Agreement which by their terms require performance by the parties after the expiration or termination of this Agreement shall be enforceable notwithstanding said expiration or other termination of this Agreement for any reason whatsoever.

16.07 Successors And Assigns.

This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Franchisor and shall be binding upon and inure to the benefit of Franchisee and its or their respective heirs, executors, administrators, successors and assigns, subject to the restrictions on Assignment contained herein.

16.08 Joint And Several Liability.

If Franchisee consists of more than one person or entity, or a combination thereof, the obligations and liabilities of each such person or entity to Franchisor are joint and several.

16.09 Governing Law.

This Agreement shall be deemed executed in California, and this Agreement and the legal relations among the parties hereto shall be governed by and construed in accordance with the laws of the state of California without giving effect to conflict of laws.

16.10 Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

16.11 Fees And Expenses.

Should any party hereto commence any action or proceeding for the purpose of enforcing, or preventing the breach of, any provision hereof, whether by arbitration, judicial or quasi-judicial action or otherwise, or for damages for any alleged breach of any provision hereof, or for a declaration of such party's rights or obligations hereunder, or commence any appeal therefrom, then the prevailing party shall be reimbursed by the losing party for all costs and expenses incurred in connection herewith, including reasonable attorneys' fees for the services rendered to such prevailing party.

16.12 Notices.

All notices which Franchisor is required or may desire to give to Franchisee under or in connection with this Agreement may be delivered to Franchisee or may be sent by certified or registered mail, postage prepaid, addressed to Franchisee at the Franchised Location. All notices which Franchisee is required or may desire to give to Franchisor under or in connection with this Agreement, must be sent by certified or registered mail, postage prepaid, addressed to Franchisor as follows:

> General Counsel
> International House of Pancakes, Inc.
> 450 N. Brand Boulevard, 7th Floor
> Glendale, California 91203-2306

The addresses herein given for notice may be changed at any time by either party by written notice given to the other party as herein provided. Notices shall be deemed effective 5 days after deposit in the United States mails.

16.13  Relationship Of Franchisee To Franchisor.

It is expressly agreed that the parties intend by this Agreement to establish between Franchisor and Franchisee the relationship of franchisor and franchisee, and that it is not the intention of either party to undertake a joint venture or to make Franchisee in any sense an agent, partner, employee or affiliate of Franchisor or any Franchisor Affiliate. It is further agreed that Franchisee has no authority to create or assume in the name of, or on behalf of, Franchisor or any Franchisor Affiliate any obligation, express or implied, or to act or purport to act as the agent or representative of Franchisor or any Franchisor Affiliate for any purpose whatsoever.

16.14  Gender And Construction.

All terms used in any one number or gender shall extend to mean and include any other number and gender as the facts, context, or sense of this Agreement or any Article or Section hereof may require. As used in this Agreement, the words "include," "includes" or "including" are used in a non-exclusive sense. Unless otherwise expressly provided herein to the contrary, any consent, approval or authorization of Franchisor which Franchisee may be required to obtain hereunder may be given or withheld by Franchisor in its sole and absolute discretion, and on any occasion where Franchisor is required or permitted hereunder to make any judgment or determination, including any decision as to whether any condition or circumstance meets Franchisor's standards or satisfaction, Franchisor may do so in its sole subjective judgment.  Section and paragraph titles used in this Agreement are for convenience only and shall not be deemed to affect the meaning of any of the terms, provisions, covenants or conditions of this Agreement.

16.15  Payments.

All payments required hereunder, shall be paid in United States Dollars.

16.16 Non-Solicitation.

During the Term of this Agreement and for 1 year following the expiration or termination and each Assignment, Franchisee shall not, without the prior written consent of Franchisor, directly or indirectly: (a) employ or attempt to employ any person who at that time is employed by Franchisor, an Affiliate of Franchisor, or any other Franchisee or area developer of Franchisor, including, without limitation, any manager or assistant manager; (b) employ or attempt to employ any person who within six (6) months prior thereto had been employed by Franchisor, an Affiliate of Franchisor, or any other Franchisee or area developer of Franchisor; or (c) induce or attempt to induce any person to leave his or her employment with Franchisor, an Affiliate of Franchisor, or any franchisee or area developer of Franchisor.

XVII
SUBMISSION OF AGREEMENT

17.01  General.

The submission of this Agreement does not constitute an offer, and this Agreement shall become effective only upon the execution thereof by Franchisor and Franchisee.  THIS AGREEMENT SHALL NOT BE BINDING ON FRANCHISOR UNLESS AND UNTIL IT SHALL HAVE BEEN ACCEPTED AND SIGNED BY AN AUTHORIZED OFFICER OF FRANCHISOR.  THIS AGREEMENT SHALL NOT BECOME EFFECTIVE UNTIL AND UNLESS FRANCHISEE SHALL HAVE RECEIVED A FRANCHISE

OFFERING CIRCULAR IN SUCH FORM AND MANNER AS MAY BE REQUIRED UNDER OR PURSUANT TO APPLICABLE LAW.

IN WITNESS WHEREOF, Franchisor and Franchisee have caused this Agreement to be executed as of the day and year first above written.

FRANCHISOR:
INTERNATIONAL HOUSE OF PANCAKES, INC.,
a Delaware corporation

By: _____
Richard C. Cello
Its: Vice President - Franchise & Development

By: _____
Mark D. Weisberger
Its: Vice President - Legal

I HEREBY ACKNOWLEDGE THAT AT MY FIRST PERSONAL MEETING WITH FRANCHISOR, AT LEAST 10 BUSINESS DAYS PRIOR TO THE DATE THAT I HAVE EXECUTED THIS AGREEMENT, OR HAVE PAID ANY CONSIDERATION THEREFOR, I RECEIVED, AND HAVE SINCE READ, FRANCHISOR'S UNIFORM FRANCHISE OFFERING CIRCULAR; I HEREBY ALSO ACKNOWLEDGE THAT I RECEIVED A COMPLETELY PREPARED COPY OF THIS AGREEMENT MORE THAN 5 BUSINESS DAYS PRIOR TO THE DATE I HAVE EXECUTED SAME.

FRANCHISEE:
1385 - TYLER, INC.
a Texas corporation

By: _____
Meredith Elston, President

IHOPOC305                    41

EXHIBIT "A" TO FRANCHISE AGREEMENT

IHOP #1385

THE FRANCHISED AREA SHALL CONSIST OF A CIRCULAR AREA WITH THE FRONT ENTRANCE DOOR OF THE FRANCHISED RESTAURANT AT THE CENTER AND A RADIUS OF TWO (2) MILES, AND SHALL SPECIFICALLY EXCLUDE ANY IHOP RESTAURANT(S) IN EXISTENCE AT THE TIME OF THE EXECUTION OF THIS FRANCHISE AGREEMENT WHICH ARE OR MAY BE LOCATED WITHIN THIS CIRCULAR AREA.